Rex Allen MURPHY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2015–SC–000487–MR

Supreme Court of Kentucky.

FEBRUARY 16, 2017

39

COUNSEL FOR APPELLANT: John Gerhart Landon, Assistant Public Advocate, Department of Public Advocacy

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Jeffrey Ray Prather, Assistant Attorney General, Office of the Attorney General

OPINION OF THE COURT BY JUSTICE HUGHES

Appellant, Rex Allen Murphy, appeals as a matter of right from a judgment of the Pulaski Circuit Court sentencing him to thirty years' imprisonment for first-degree sodomy, first-degree sexual abuse, and use of a minor in a sexual performance. Murphy raises seven issues on appeal: 1) the trial court erred by failing to direct a verdict of acquittal for first-degree sodomy and first-degree sexual abuse; 2) the trial court violated double jeopardy when it failed to differentiate between first-degree sodomy and first-degree sexual abuse in the jury instructions; 3) the trial court erred by failing to include an instruction for the lesser included offense of sexual misconduct; 4) the trial court erred by permitting the Commonwealth to ask lay witnesses for legal conclusions; 5) the Commonwealth's statements during closing argument constituted palpable error; 6) the trial court erred by excluding mitigation evidence; and 7) cumulative error supports reversal. For the following reasons, we affirm Murphy's conviction for use of a minor in a sexual performance, reverse his convictions for first-degree sodomy and first-degree sexual abuse, and remand this case to the trial court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2013, when Paul was fifteen-years-old, Murphy, who was almost thirty-years old, became a member of the church Paul attended.[1] In April 2014, Murphy began to

1. The name of the minor victim in this opinion has been replaced with a pseudonym to preserve his privacy.

teach the church's Sunday school class. There were only seventeen members of the congregation and the Sunday school class only had two to three pupils, including Paul and his brother. These classes, which initially focused on bible study and discussion, over time became focused on personal and sexual topics.

During the course of Paul and Murphy's discussions, Murphy claimed to have "dark magic powers" and that he had the ability to erase a person's mind. Murphy also asserted that he was able to see a person's sins and sexuality by touching their hands. Murphy convinced Paul that his sin was bisexuality and offered to help Paul fight this "sin" by tempting him sexually, so that he would become stronger and not give into his urges.

Several weeks into teaching Paul's Sunday school class, Murphy asked Paul to help him with work on his residence. With Paul's parents' approval, Murphy would pick up Paul and drive him to Murphy's residence, where the two would work together every other week. While driving to the residence, the pair would not only discuss Paul's day, but also sexual topics. On more than one occasion, Murphy would bring up a sexual topic as a "test" and then during the resulting discussion check to see whether Murphy had an erection. Other examples of Murphy's conduct during their time in the truck included: 1) touching Paul's genitals over his clothing; 2) discussing oral sex with Paul; and 3) requesting to see Paul's genitals.

One evening after a cross-country race, in which Paul participated, Paul and Murphy were alone in Murphy's truck. After Murphy discussed homosexuality and sexual temptation, he played a pornographic video on his phone and watched it with Paul. Afterwards, Murphy had Paul expose his penis so that Murphy could sexually stimulate him. Later in the evening, Paul and Murphy exited the vehicle and entered the woods, where Murphy asked Paul to anally sodomize him. Despite Paul's efforts, he was unable to complete the sexual act. Subsequently, Paul informed Murphy that he did not want to engage in sodomy, which made Murphy upset. After this incident, Paul stopped going to Murphy's residence.

In September 2014, Murphy contacted Paul to inform him that he had completed the work on the residence and wanted to celebrate. Paul agreed to let Murphy pick him up, due to his belief that Murphy's wife would be home during his visit. Unbeknownst to Paul, Murphy's wife was at church, and consequently he would be alone with Murphy. Once at the residence, Murphy began to discuss sexual topics with Paul. Afterwards, he asked Paul to masturbate in front of him and provided him with lubricant to do so. Paul agreed and Murphy watched him perform the sex act. Subsequently, Murphy and Paul went into the bedroom where Paul removed his clothes. Murphy then began to kiss Paul's torso and groin area and put his mouth and hands on Paul's penis. When Murphy's wife returned home, Paul and Murphy discontinued the sexual acts. Before driving Paul home that evening, Murphy threatened to kill him if he were to reveal what had happened.[2]

In October 2014, Paul admitted to a co-worker at the hospital where he volunteered that Murphy had inappropriately touched him and threatened him with witchcraft. The co-worker reported the

---

**2.** Paul also testified that Murphy threatened to use his black magic powers against him, if he were to reveal to others what had happened that evening.

abuse to the police who began an investigation. As part of that investigation, Eubank Police Chief Colin Hatfield and social service worker Brittany Penick spoke with Murphy at his residence. Murphy told Chief Hatfield and Penick that he had been cursed with witchcraft, and that the Lord revealed things to him when he touched a person's hand. Murphy went on to say that the Lord had informed him that Paul was dealing with homosexuality. Additionally, Murphy admitted to touching and engaging in sexual acts with Paul. Murphy's admission was only partially recorded, as the tape recorder that Chief Hatfield and Penick used stopped working during the recording.

Murphy was indicted by the Pulaski County grand jury in November 2014, for first-degree sodomy, first-degree sexual abuse, and use of a minor in a sexual performance. In Murphy's February 2015 trial, the Commonwealth called three witnesses: Paul, Chief Hatfield, and Penick. In his testimony, Paul explained that he went along with Murphy's sexual requests because of his fear of Murphy's black magic powers. Specifically, Paul was worried that Murphy would use those powers to erase his mind. Additionally, Paul testified that Murphy had previously threatened him with the use of black magic.

Murphy declined to testify or call any witnesses in the guilt phase of his trial. His defense was that the sexual acts with Paul were legal and consensual, as Paul was sixteen years old when the sexual offenses alleged at trial occurred. Additionally, Murphy claimed that the Commonwealth provided insufficient evidence to establish forcible compulsion and that his providing lubricant to Paul did not constitute induce-

ment so as to convict him of use of a minor in a sexual performance.

Murphy was convicted of all charges and the jury recommended fifteen years' imprisonment for first-degree sodomy, five years' imprisonment for first-degree sexual abuse, and ten years' imprisonment for use of a minor in a sexual performance. The jury recommended that those sentences be served consecutively for a total sentence of thirty years' imprisonment. After denying Murphy's motion for a new trial and for a judgment of acquittal, the trial court sentenced Murphy in conformance with the jury's recommendation. Murphy brings this appeal as a matter of right.

## ANALYSIS

### I. The Trial Court Erred by Failing to Direct a Verdict of Acquittal for First–Degree Sodomy and First–Degree Sexual Abuse.

■ Murphy argues that the Commonwealth failed to produce sufficient evidence of the element of "forcible compulsion" to convict him of first-degree sodomy and first-degree sexual abuse.[3] As such, he contends that the trial court committed reversible error in denying his motion for directed verdict.

At the close of the Commonwealth's case, Murphy made a motion for a directed verdict on both the first-degree sodomy and first-degree sexual abuse charges. Murphy first argued that there was insufficient evidence presented to prove the forcible compulsion element of first-degree sodomy. In denying Murphy's motion, the trial court found that Murphy had engaged in a pattern of behavior that groomed Paul to be receptive of further sexual advances by using Paul's fear of Murphy's alleged

---

**3.** Murphy has four separate arguments regarding the denial of the motion for directed verdict and the trial court's instructions for first-degree sodomy and first-degree sexual abuse. As these arguments are intertwined we choose to address them together.

black magic powers. Additionally, the trial court concluded that Murphy's behavior rose to the level of an implicit threat of force. Subsequently, Murphy made a motion for directed verdict for first-degree sexual abuse, arguing that that this offense was part of the same continuous act as first-degree sodomy. The trial court also denied this motion. After declining to present any proof, Murphy made a renewed motion for a directed verdict which was also denied.

On appeal, Murphy alleges that the trial court erred by denying his motion for directed verdict for first-degree sodomy and first-degree sexual abuse due to insufficient evidence of forcible compulsion. While Murphy's directed verdict argument for first-degree sodomy was properly preserved for appellate review, his directed verdict argument for first-degree sexual abuse is unpreserved.

Kentucky Rule of Civil Procedure (CR) 50.01 states, in pertinent part "[a] motion for a directed verdict shall state the specific grounds therefor." CR 50.01 has previously been applied to criminal cases and "its requirement of 'specific grounds' must be followed to preserve for appellate review a denial of a motion for a directed verdict of acquittal." *Potts v. Commonwealth*, 172 S.W.3d 345, 348 (Ky. 2005). The failure to identify a particular ground in a motion for directed verdict forecloses appellate review of the trial court's denial of the motion except to the extent that palpable error is shown. *McCleery v. Commonwealth*, 410 S.W.3d 597, 601–602 (Ky. 2013) (citing *Pate v. Commonwealth*, 134 S.W.3d 593, 597–98

(Ky. 2004)) Kentucky Rule of Criminal Procedure (RCr) 10.26.[4]

As Murphy failed to raise his forcible compulsion argument in his motion for directed verdict for first-degree sexual abuse that argument was not properly preserved for appellate review. We reject Murphy's argument that his discussion of forcible compulsion in his motion for directed verdict for first-degree sodomy, preserved the forcible compulsion argument as to first-degree sexual abuse. We further note that Murphy failed to request palpable error review of this issue pursuant to RCr 10.26. "Absent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review pursuant to RCr 10.26 unless such a request is made and briefed by the appellant." *Shepherd v. Commonwealth*, 251 S.W.3d 309 (Ky. 2008) (citing *Thomas v. Commonwealth*, 153 S.W.3d 772, 782 (Ky. 2004); *Bray v. Commonwealth*, 177 S.W.3d 741, 752 (Ky. 2005)). Because, under the facts presented, a decision not to review Murphy's conviction for first-degree sexual abuse would cause a substantial miscarriage of justice, this Court will review for palpable error.

"The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that a conviction be supported by proof of guilt beyond a reasonable doubt." *Gribbins v. Commonwealth*, 483 S.W.3d 370, 377 (Ky. 2016) (citing *Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In considering a motion for directed verdict, the trial court is required to "draw all fair and reasonable inferences from the

4. The palpable error rule mandates reversal when "manifest injustice has resulted from the error." *Elery v. Commonwealth*, 368 S.W.3d 78, 98 (Ky. 2012) (quoting RCr 10.26). To determine whether there has been manifest injustice, the Court focuses "on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

evidence in favor of the Commonwealth." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). A directed verdict should not be granted if a reasonable juror could find that the elements of the offense were proven beyond a reasonable doubt. *Id.* "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)).

Under Kentucky Revised Statute (KRS) 510.070 a person is guilty of first-degree sodomy when "[h]e engages in deviate sexual intercourse with another person by forcible compulsion[.]" Similarly, under KRS 510.110 a person is guilty of first-degree sexual abuse when "[h]e or she subjects another person to sexual contact by forcible compulsion[.]" KRS 510.010(2) defines "forcible compulsion" as "physical force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this [KRS Chapter 510]. Physical resistance on the part of the victim shall not be necessary to meet this definition."

In the case at bar, Paul explained that over an extended period, Murphy convinced him that he, Murphy, was imbued with special powers. Paul believed that Murphy could touch a person's hand and that God would inform him of that person's sins. Significantly, Paul became convinced that Murphy could practice witchcraft or dark magic and use this power to erase minds.

During his testimony, Paul admitted to fearing Murphy due to Murphy's self-professed witchcraft powers. Specifically, Paul feared that if he did not do what Murphy

wanted that Murphy would respond by "erasing" Paul's mind. Paul testified on more than one occasion Murphy had threatened the use of black magic. While the men discussed black magic on the day in which the sodomy and sexual abuse were alleged to have occurred, Paul did not identify any threats made by Murphy during that conversation.

█ As is clear from its definition, forcible compulsion may be shown in two broad ways: an act of physical force or a threat of physical force. Here, there was no evidence presented that Murphy employed physical force to compel Paul to submit to sodomy or sexual abuse. Indeed, the Commonwealth does not argue that Murphy used physical force in his interactions with Paul. *Cf. Jenkins v. Commonwealth*, 496 S.W.3d 435, 446 (Ky. 2016) (reasonable jury could have believed that the defendant by forcibly rolling the victim over, removing her pajama pants, and physically pushing aside attempts to block the assault, defendant forcibly compelled sexual acts.); *Gibbs v. Commonwealth*, 208 S.W.3d 848, 856 (Ky. 2006) *overruled on other grounds by Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky. 2010) (defendant's act of taking the victim's hand and placing on his penis met the requisite physical force requirement of the sexual abuse statute.).

Despite the lack of physical force, the Commonwealth argues that Murphy's threats were nonetheless sufficient to meet the statutory element of forcible compulsion. Murphy responds to this argument by contending that the Commonwealth failed to produce sufficient evidence that the sex acts resulted from "a threat of physical force, express or implied" which placed Paul in fear of "immediate death [or] physical injury." Specifically, Murphy argues that: 1) a threat to use black magic to erase a person's mind does not consti-

tute a threat of immediate death or physical injury under KRS 500.080(13); 2) that the Commonwealth failed to produce evidence that Murphy threatened Paul with black magic in order to get him to engage in the acts; and 3) that even if a threat were made it was not sufficiently immediate to the sexual acts.

█ In evaluating whether a threat satisfies the element of forcible compulsion, the Court does not employ an objective test. Rather, "[i]n determining whether the victim felt threatened to engage in sex or feared harm from the attacker, a subjective test is applied." *Newcomb v. Commonwealth*, 410 S.W.3d 63 (Ky. 2013) (citing *James v. Commonwealth*, 360 S.W.3d 189, 195 (Ky. 2012); *Salsman v. Commonwealth*, 565 S.W.2d 638, 641 (Ky. App. 1978)). In *Yarnell v. Commonwealth*, 833 S.W.2d 834, 836 (Ky. 1992), this Court noted that the conclusion that the victim's fear is to be judged by a subjective standard was supported by the commentary accompanying the final draft of the Kentucky Penal Code, published in November 1971. Although the definition of forcible compulsion has been modified from its 1971 wording, that modification has no bearing on the portion of the accompanying commentary that we find pertinent.[5] In discussing the definition of "forcible compulsion," the commentary states that "[t]he definition does not require that the victim's fear be 'reasonable.' One who takes advantage of a victim's unreasonable fears of violence should not escape punishment any more than the swindler who cheats gullible people by false statements which they should have found incredible."

█ While the victim's fear is judged by a subjective standard, forcible compul-

sion requires the use of physical force or the threat of physical force and the fear must be of "immediate death, physical injury to self ..., fear of the immediate kidnap of self ... or fear of any offense under [KRS Chapter 510]." The threat to erase a person's mind by invoking black magic does not qualify as a threat of physical force. This conclusion derives from the meaning of the word "physical." *BLACK'S LAW DICTIONARY* contains several definitions for "physical," but the one most pertinent to this discussion is "[o]f, relating to, or involving someone's body as opposed to mind." *BLACK'S LAW DICTIONARY* (10th ed. 2014). Under this definition, a threat to erase Paul's mind through black magic would not qualify as a threat of physical force because no physical act would be threatened. Moreover, the feared end result of the black magic (an erased mind) would be a mental injury, not a physical injury. Therefore, while Paul may have sincerely believed that Murphy could erase his, Paul's, mind through the use of black magic, this type of conduct and his subjective fear of the end result do not constitute forcible compulsion.

Further, even if the Court were to agree with the Commonwealth that a threat of black magic could satisfy the "physical" elements of forcible compulsion as to both the threat and the feared injury, the Commonwealth failed to produce sufficient evidence of the existence of such a threat in temporal proximity to the charged offenses. The Commonwealth fails to point to an explicit threat made by Murphy to Paul on the day in which the sodomy and sexual abuse were alleged to have occurred. Rather, the Commonwealth argues that Paul was in constant fear of physical injury and that the perceived threat was immediate

---

5. KRS 500.100 provides: "The commentary accompanying this code may be used as an aid in construing the provisions of this code."

and ongoing. In support of this argument, the Commonwealth relies on *Yarnell,* a case that is significantly different from the one before us.

Yarnell was convicted of a myriad of sexual offenses for abuse perpetrated on his two step-children. 833 S.W.2d at 835. On appeal, Yarnell argued that he was entitled to a directed verdict, as the prosecution failed to prove the element of forcible compulsion. *Id.* at 836. The evidence at trial, established that Yarnell created a climate of fear, through constant emotional, verbal, and physical abuse of his step-children. *Id.* at 837. Specifically, both children testified that they were afraid of Yarnell, due to his yelling, screaming, and use of obscenities. *Id.* at 836. Yarnell's step-son attempted to avoid Yarnell, by staying in his bedroom and not coming out until he had left. *Id.* Additionally, Yarnell physically abused his step-daughter by hitting her, throwing her against a wall, and ripping her clothes. *Id.* The step-daughter testified to unsuccessfully fighting back on at least one occasion, after which Yarnell threw her on a bed and raped her. *Id.* Both children testified that Yarnell would punish them by forcing them to perform oral sex with him. *Id.* During the trial, the children explained that they submitted to this sexual abuse due to fear of what Yarnell might do to them or their mother if they refused to comply. *Id.* at 837. In reviewing the evidence, the Court concluded that "it was not clearly unreasonable for the jury to find that Yarnell engaged in sexual intercourse with the children by means of forcible compulsion." *Id.*

The Commonwealth's reliance on *Yarnell* is misplaced. In *Yarnell* it was clear that there was a climate of fear created by the continuing physical and emotional abuse of the children during the nine years they lived with Yarnell. Yarnell's regular practice of screaming at and physically abusing his stepchildren raised reasonable concerns about what he might do if his sexual demands were refused. In the case at bar, it is clear that Paul was able to refuse Murphy's sexual advances without violent reprisal.

As noted above, one evening, Paul and Murphy exited Murphy's vehicle and entered the woods where Murphy requested that Paul sodomize him. Paul was unable to complete the sexual act and informed Murphy that he did not want to engage in sodomy, which upset Murphy. However, Paul failed to identify any threats made or force displayed by Murphy in the aftermath of the incident.[6] Further, on a different occasion, Murphy attempted to touch Paul sexually, who rebuffed his advances, and there were no repercussions. The absence of either physical force or repeated threats of physical force renders this case substantially dissimilar from *Yarnell* where the victims lived in a constant climate of fear in their own home.

While *Yarnell* is not on point, our recent decisions in *Newcomb* and *James v. Commonwealth,* 360 S.W.3d 189 (Ky. 2012), offer insight to the forcible compulsion issue raised in this case. In *James,* the defendant and the victim were engaged in a long-term relationship that became so contentious that a series of emergency protective orders and domestic violence orders were entered. *Id.* at 192. However, in direct violation of these orders the couple continued to cohabitate. *Id.* One evening, James began to savagely beat the victim. *Id.* Over a five-hour period, James grabbed the victim's hair, dragged her across the room, kicked her, spit on her,

---

**6.** Murphy and Paul saw each other the next day at church. During their meeting, Murphy showed Paul a list of people whom he wanted to kill. It was not suggested during his testimony that Paul's name was on this list or what if any threat this conveyed to Paul.

punched her in the face and head, kicked her in the ribs and back, put his hands around her throat, and threatened to kill her. *Id.* at 192–193. During a lull in the beatings, the victim noticed that James had an erection. *Id.* Seeing this, the victim decided that if she were to have sexual intercourse with James that the beatings would stop and so she engaged in various sexual acts with him. *Id.* Subsequently, the victim contacted the police about the abuse and James was eventually convicted, among other charges, of first-degree rape and first-degree unlawful imprisonment. *Id.*

On appeal, James argued that the Commonwealth failed to prove the forcible compulsion element of first-degree rape. *Id.* at 194. James contended that there was a lack of proof that he initiated the sexual acts or threatened the victim to induce the victim to engage in sexual activity. *Id.* In concluding that a reasonable jury could find forcible compulsion from the evidence presented at trial, the Court relied on the fact that the victim had been beaten for several hours before engaging in sexual activity and that the victim believed that sexual submission was necessary to prevent future beatings. *Id.* at 195. Additionally, James repeatedly refused the victim's requests to be permitted to leave or for him to leave the apartment. *Id.* The Court concluded that this evidence "established [the victim's] subjective view that she had been threatened to engage in sex, which is sufficient to prove forcible compulsion." *Id.* The Court also determined that a jury could have concluded that James's kissing the victim with a visible erection, "presented a choice between engaging in sexual conduct or suffering further violence." *Id.* Accordingly, the Court determined that the Commonwealth provided sufficient proof to satisfy the element of forcible compulsion. *Id.* at 197. *Cf. Yates v. Commonwealth,* 430 S.W.3d 883 (Ky. 2014) (threatened revelation of young victim's secret relationship with older boy, which if reported by the victim's mother could result in criminal charges and harm to victim's boyfriend, did not constitute a threat of immediate death or physical injury to another person.).

Similarly, in *Newcomb* the Court addressed whether there was sufficient evidence to meet the element of forcible compulsion in the offense of first-degree rape. 410 S.W.3d at 78–79. The evidence presented by the Commonwealth at trial established that the victim was in her home preparing to do laundry when she realized that Newcomb was standing in her living room. *Id.* at 71. The door to the victim's home had not been completely closed and Newcomb had entered without invitation or announcing himself. *Id.* Subsequently, Newcomb forced the victim to him and began to kiss her neck, saying "[y]ou know you want me." *Id.* The victim resisted these advances and asked Newcomb to leave, but despite the victim's protests Newcomb continued to kiss her. *Id.* Newcomb then began unfastening the victim's belt, but she refastened it. *Id.* When Newcomb began to loosen her belt a second time, the victim froze in fear. *Id.* Afterward Newcomb had intercourse with the victim on her couch, against her will. *Id.* The victim later explained that she did not scream or fight, due to her fear and shock. *Id.*

In rejecting Newcomb's argument that there was insufficient evidence of forcible compulsion, the Court noted that Newcomb employed physical force in committing the rape, specifically by drawing the victim close to him, kissing her neck, unfastening her belt, and pulling her pants down. *Id.* at 80. While physical resistance by the victim is unnecessary, the Court noted that the victim resisted Newcomb by struggling with him to keep her belt fastened and her pants pulled up. *Id.* Additionally, the victim testified that her sub-

mission to Newcomb's sexual advances was made out of fear. *Id.* Accordingly, the Court determined that, "[s]ufficient evidence existed for the jury to determine that [the victim] subjectively felt threatened to engage in sex or feared harm from Newcomb if she did not submit to his sexual advances." *Id.*

Unlike *James* and *Newcomb*, there was insufficient evidence in the case at bar to establish that the sexual activity in question was compelled by an implicit threat of physical force. Paul's testimony is clear that he was fearful of Murphy's self-professed powers and that Murphy had threatened the use of those powers in the past. Yet, while the pair discussed black magic on the day in question, Paul did not classify that discussion as a threat. Further, Paul's testimony does not specify any physical act or statement by Murphy that would suggest an implicit threat of physical force at the time of the sexual acts. Rather, Paul's testimony established that after he initially declined to participate in sexual acts he was convinced to do so by Murphy. Paul did not elaborate on how he was convinced to participate in sexual acts with Murphy, but there clearly was no testimony about a contemporaneous threat of physical force or use of physical force. *Cf State v. Goupil,* 154 N.H. 208,908 A.2d 1256, 1270 (2006) ("We conclude, therefore, that the initial repeated verbal threats, along with the actual physical assaults and threats with the knife, constituted an implicit threat throughout the entire ordeal."). As such, there is insufficient evidence of an express or implied threat of physical force.[7]

Murphy's predatory conduct, while certainly reprehensible, does not satisfy the element of forcible compulsion to sustain a conviction for first-degree sodomy. As Murphy could not have been convicted of first-degree sodomy by forcible compulsion, the trial court abused its discretion in denying the motion for a directed verdict.

While Murphy's claim of error as to the denial of his motion for directed verdict for first-degree sexual abuse on the same ground was not preserved, we are constrained to conclude that that conviction, based on conduct that occurred close in time to the alleged sodomy and also involving no forcible compulsion under KRS 510.010(2) must be reversed. In the absence of proof of this critical element of the criminal offense, manifest injustice would result from allowing the conviction to stand.

## II. Two of Murphy's Remaining Arguments Concerning His First–Degree Sodomy and First–Degree Sexual Abuse Convictions are Moot.

Murphy alleges three additional errors concerning his convictions for first-degree sodomy and first-degree sexual abuse. First, Murphy contends that the trial court failed to differentiate the first-degree sodomy and first-degree sexual abuse charges in the jury instructions. Second, Murphy alleges that the Commonwealth was permitted to ask two witnesses for legal conclusions. Specifically, two witnesses who interviewed Murphy were asked whether he admitted to sodomy as to Paul. Third, Murphy argues that the trial court erred

---

**7.** Paul testified that *after* the commission of the sexual acts Murphy threatened the use of his black magic powers and threatened to kill Paul if he were to reveal what had occurred. These explicit threats after the sexual acts were also insufficient to meet the element of forcible compulsion. *See generally, Miller v. Commonwealth,* 77 S.W.3d 566, 575–576 (Ky. 2002) ("The only threat she described was that, on one unspecified occasion, Appellant told her they would both get in trouble if she told anyone what they were doing. While that might explain delayed reporting, it does not prove that [the victim] was compelled by force or threat to submit to sexual intercourse or oral sodomy.").

by failing to include a jury instruction for sexual misconduct as a lesser included offense to first-degree sodomy. However, in light of our decision that the trial court should have granted the motion for directed verdict as to first-degree sodomy and first-degree sexual abuse, the first two of these remaining arguments are moot.

As noted, the trial court erred by failing to grant a directed verdict for first-degree sodomy and first-degree sexual abuse due to the Commonwealth's failure to prove the element of forcible compulsion. "A reversal of a judgment of conviction on appeal on the ground that no reasonable trier of fact could have found guilt on the basis of the evidence at trial precludes a retrial of the case because of prior jeopardy." *Nichols v. Commonwealth*, 657 S.W.2d 932, 933 (Ky. 1983) (citing *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)); *Commonwealth v. Burris*, 590 S.W.2d 878 (Ky. 1979)). Consequently, the Commonwealth is barred from retrying Murphy for either of those offenses.[8] Accordingly, the Court does not need to examine whether the trial court erred in its instructions for first-degree sodomy or first-degree sexual abuse, nor does the Court need to consider whether the Commonwealth impermissibly asked witnesses for a legal conclusion as to the sodomy charge.

## III. The Trial Court Did Not Err By Denying Murphy's Request For a Sexual Misconduct Jury Instruction.

Additionally, Murphy contends that the trial court erred by failing to instruct on the lesser included offense of sexual misconduct.[9] Specifically, Murphy argues that this instruction was appropriate as the jury could have believed that Murphy engaged in deviate sexual intercourse without Paul's consent, as opposed to by forcible compulsion or through a position of special trust or authority.

The trial court is required to instruct the jury on the "whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999) (citing Kentucky Rule of Criminal Procedure (RCr) 9.54(1); *Kelly v. Commonwealth*, 267 S.W.2d 536, 539 (Ky. 1954)). Further, the trial court is mandated to "instruct the jury on all lesser-included offenses which are supported by the evidence." *Yarnell*, 833 S.W.2d at 837 (citing *Cannon v. Commonwealth*, 777 S.W.2d 591 (1989)); *McClellan v. Commonwealth*, 715 S.W.2d 464 (Ky. 1986).

The trial court properly denied Murphy's request for a sexual misconduct jury instruction as it was not supported by the evidence. In *Cooper v. Commonwealth*, 550 S.W.2d 478, 479 (Ky. 1977), the Court held that the sexual misconduct statute was intended to apply only in cases where the victim's non-consent was premised on his age and where the perpetrator's young age could likewise be considered a mitigating

---

8. While the Court's determination precludes Murphy from being retried for first-degree sodomy and first-degree sexual abuse, the Commonwealth is permitted to retry Murphy for the lesser included offense of third-degree sodomy. *See Combs v. Commonwealth*, 198 S.W.3d 574, 579 (Ky. 2006); *McGinnis v. Wine*, 959 S.W.2d 437, 438–39 (Ky. 1998).

9. KRS 510.140 provides as follows: (1) A person is guilty of sexual misconduct when he engages in sexual intercourse or deviate sexual intercourse with another person without the latter's consent. (2) Sexual misconduct is a Class A misdemeanor.

factor. *Id.*[10] This longstanding interpretation of the sexual misconduct statute was recently reaffirmed in *Jenkins.*

As in *Cooper,* Jenkins argued that he was entitled to a jury instruction on sexual misconduct as a lesser offense included within the more serious charges of rape and/or sodomy. *Jenkins,* 496 S.W.3d at 452. Relying on the *Cooper* Court's construction of KRE 510.140, this Court determined that the requested instruction was not appropriate, as neither the victim nor perpetrator was within the statute's intended age limits. *Id.* In the case at bar, both Murphy and Paul were over the pertinent ages at the time of the alleged offenses. Accordingly, KRS 510.140 was inapplicable and the trial court properly denied Murphy's requested jury instruction.

## IV. Prosecutorial Misconduct Did Not Rise to the Level of Palpable Error.

Murphy alleges multiple instances of prosecutorial misconduct in the Commonwealth's closing argument. Specifically, Murphy argues that the Commonwealth engaged in a pattern of misconduct by: 1) ripping pages out of a criminal statute book; 2) raising his voice to Murphy and trial counsel; 3) improperly making reference to the trial court's use of initials in place of the victim's name in the jury instructions; 4) commenting on Murphy's silence; 5) referring to Murphy as a "monster"; and 6) introducing facts not admitted into evidence.

 "Prosecutorial misconduct is 'a prosecutor's improper or illegal act involv-

ing an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Commonwealth v. McGorman,* 489 S.W.3d 731, 741–742 (Ky. 2016) (quoting *Noakes v. Commonwealth,* 354 S.W.3d 116, 121 (Ky. 2011)). The misconduct can occur in a variety of forms, including improper closing argument. *Dickerson v. Commonwealth,* 485 S.W.3d 310, 329 (Ky. 2016) (citing *Duncan v. Commonwealth,* 322 S.W.3d 81, 87 (Ky. 2010)). In considering an allegation of prosecutorial misconduct, the Court must view that allegation in the context of the overall fairness of the trial. *McGorman,* 489 S.W.3d at 742. To justify reversal, the Commonwealth's misconduct must be "so serious as to render the entire trial fundamentally unfair." *Soto v. Commonwealth,* 139 S.W.3d 827, 873 (Ky. 2004) (quoting *Stopher v. Commonwealth,* 57 S.W.3d 787, 805 (Ky. 2001)).

 "If the misconduct is objected to, we will reverse on that ground if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury." *Duncan v. Commonwealth,* 322 S.W.3d 81, 87 (Ky. 2010) (citing *Barnes v. Commonwealth,* 91 S.W.3d 564 (Ky. 2002); *Partin v. Commonwealth,* 918 S.W.2d 219 (Ky. 1996)). If the defendant failed to object, however, the Court "will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair." *Ordway v. Commonwealth,* 391 S.W.3d 762, 789 (Ky. 2013) (quoting *Duncan,* 322 S.W.3d at 87).

---

**10.** The commentary to KRS 510.140 reflects the prevailing construction of the statute.

When read in conjunction with the rape and sodomy statutes, KRS 510.140 is designed primarily to prohibit nonconsensual sexual intercourse or deviate sexual inter-

course under two circumstances: when the victim is 14 or 15 and the defendant is less than 21; or when the victim is 12, 13, 14, or 15 and the defendant is less than 18 years of age.

In considering an allegation of prosecutorial misconduct in closing argument, the Court considers the arguments "as a whole" while remembering that counsel is granted wide latitude during closing argument. *Brewer v. Commonwealth,* 206 S.W.3d 343, 350 (Ky. 2006) (quoting *Young v. Commonwealth,* 25 S.W.3d 66, 74–75 (Ky. 2000)). "The longstanding rule is that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn therefrom." *Padgett v. Commonwealth,* 312 S.W.3d 336, 350 (Ky. 2010) (citing *East v. Commonwealth,* 249 Ky. 46, 60 S.W.2d 137, 139 (1933)).

In his brief, Murphy condemns the actions of the prosecutor in the strongest possible terms, stating that his closing argument was "shockingly awful" and "beneath the dignity of Commonwealth Attorneys." Yet, no objection was made at trial to any of the alleged instances of prosecutorial misconduct and, curiously, no explanation is offered on appeal for trial counsel's failure to object. In any event, as the alleged misconduct was not objected to, Murphy is unable to meet the requirements of *Barnes.* However, Murphy has requested and the Court will review the alleged instances of prosecutorial misconduct for palpable error under RCr 10.26.

First, Murphy asserts that the Commonwealth "desecrated the law," by dramatically ripping pages out of a copy of the *Criminal Law of Kentucky.*[11] During Murphy's closing argument, he claimed that the acts alleged in the indictment were willfully performed by Paul as part of a consensual sexual relationship. In response, the prosecutor argued that Murphy had preyed on Paul. To emphasize the non-consensual nature of the sexual acts, the prosecutor began to tear out the sec-

tions of the *Criminal Law of Kentucky,* which dealt with the crimes charged against Murphy. Murphy contends that the Commonwealth's actions implied to the jury that he was asking them to nullify the law in this case. While we do not approve of the prosecutor's overly theatrical approach, especially when viewed in the context of other closing argument behavior, we conclude the prosecutor was trying to respond forcefully to Murphy's contention that the sexual acts with Paul were of a consensual nature. The Commonwealth never asked the jury to disregard the law nor suggested that Murphy was asking the jury to ignore the law. Under these circumstances, the behavior cannot be labeled an error.

Next, Murphy argues that the Commonwealth repeatedly raised his voice to him and trial counsel. In this portion of his argument, Murphy includes a number of other allegations against the prosecutor: a threat of violence against Murphy, personal attacks against Murphy and counsel, criticism of Murphy for his decision to exercise his constitutional rights, and comments on Murphy's right to remain silent.

A review of the record clearly demonstrates that the prosecutor raised his voice during closing argument on multiple occasions. The act of simply raising one's voice, however, does not in and of itself constitute improper argument. "Great leeway is allowed to *both* counsel in a closing argument. It is just that—*an argument.* A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth,* 744 S.W.2d 407, 412 (Ky. 1987). The use of different oratory techniques such as rais-

---

**11.** The *Criminal Law of Kentucky* is a compilation of substantive and procedural Kentucky criminal laws.

ing or lowering the volume of speech to emphasize an argument is within the scope of acceptable conduct for closing argument. However, we will examine the content of the comments identified by Murphy to discern whether there was any prosecutorial misconduct.

Principally, Murphy takes issue with the prosecutor's use of rhetorical questions, contending that "[t]here is something monstrously unfair about allowing the person with the last word to shout allegations knowing neither the defendant nor his counsel may answer." BLACK'S LAW DICTIONARY defines a rhetorical question as "[a] question that one poses as a way of making a statement, with no real expectation of an answer; a question used not to elicit an answer but instead for rhetorical effect. BLACK'S LAW DICTIONARY (10th ed. 2014). Contrary to Murphy's argument, there is nothing intrinsically wrong with the Commonwealth's use of rhetorical questions in closing argument. Rather, rhetorical questions have long been a persuasive tool in American jurisprudence.[12] Further, a review of the statements challenged by Murphy demonstrates that the Commonwealth remained within the bounds of proper argument.

■■ The first challenged statement, "[a]nd where does the predatory prey? Where he can find the weak," is an innocuous truism.[13] The second and third challenged statements were criticisms of Murphy's counsel and his explanation for Murphy's actions. In arguing that the relationship between Paul and Murphy was not consensual as Murphy's counsel had portrayed it the prosecutor said, "[d]oes that sound like the 'Love Boat' to you, counsel? Have a little shame." While a prosecutor is not permitted to vilify the accused or his counsel, he is permitted to comment in a reasonable manner on how counsel conducts himself during the course of the trial. *See Johnson v. Commonwealth*, 302 S.W.2d 585, 587 (Ky. 1957) (no error in the prosecutor calling defense counsel arrogant in closing argument). While the prosecutor's argument, should not have been directed to counsel personally, it was designed to underscore the falsity of Murphy's defense, namely that he and Paul were engaged in a consensual sexual relationship. While the glib phrasing of this argument was unbecoming of the office of Commonwealth's Attorney, we cannot conclude that this statement vilified Murphy or his counsel, or that it rendered the trial fundamentally unfair.

**12.** In his argument for the defense in the 1770 Boston Massacre trial, John Adams repeatedly employed rhetorical questions saying:

> [W]hat had the soldiers to expect, when twelve persons armed with clubs ... were daring enough, even at the time when they were loading their guns, to come up with their clubs, and smite on their guns; what had eight soldiers to expect from such a set of people? Would it have been a prudent resolution in them, or in any body in their situation, to have stood still, to see if the sailors would knock their brains out, or not? Had they not all the reason in the world to think, that as they had done so much, they would proceed farther?

John Adams, Argument for the Defense, in 3 Legal Papers of John Adams 242, 262 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965) as cited in Gabriel H. Teninbaum, *Who Cares?* 3 Drexel L. Rev. 485 (2011).

**13.** After asking this rhetorical question, the prosecutor moved towards the defense table and shouted at Murphy to "get a grown man." Later in his closing the prosecutor repeated this conduct. These comments served no useful purpose in arguing for Murphy's guilt of the offenses contained in the indictment. While these outbursts do not make us question the overall fairness of Murphy's trial, we caution the Commonwealth against the repetition of such conduct.

Similarly, the prosecutor criticized Murphy's counsel for his questioning of Chief Hatfield and Penick saying, "[a]nd another thing, While we're at it. If it's a consensual act why did you crawl all over [Chief Hatfield and Penick] for not taping it? Because apparently they'd said the truth. Why counsel? Why'd you crawl all over them? Because you were going to say it was consensual conduct? Why?" Again, the prosecutor should not have directed personal comments to defense counsel, but we cannot agree with Murphy that the prosecutor was criticizing the exercise of his constitutional right to confront witnesses against him. This was a permissible comment on the tactics employed by the defense, albeit with language that was not well chosen.

The fourth challenged statement, "[i]f they were in a consensual relation where everything was great and lovey dovey, why did he go for help?" was a permissible comment on the defense's position that it was a consensual relationship. The fifth challenged statement concerned the offense of the use of a minor in a sexual performance, in which the prosecutor said, "[n]ow I guess having him perform a sex show for him wasn't enough people. Maybe that's it. Maybe if [Murphy] had had some of his friends over he talked about, five, six, and ten. How many people does he have to masturbate in front of for it to be a felony? That we care?" A prosecutor is permitted "reasonable latitude in argu-

ment to persuade the jurors the matter should not be dealt with lightly." *Lynem v. Commonwealth,* 565 S.W.2d 141, 145 (Ky. 1978) (citing *Harness v. Commonwealth,* 475 S.W.2d 485 (1972); *Richards v. Commonwealth,* 517 S.W.2d 237 (Ky. 1974)). It is clear that the prosecutor was trying to implore the jury to follow the law, which does not mandate that more than one person witness a minor's sexual performance in order to obtain a conviction. There was no error.[14]

Third, Murphy contends that the Commonwealth erred by making reference to the trial court's use of initials in place of the minor victim's name in the jury instructions. During his closing argument, the prosecutor alleged that Murphy's counsel did not want the state to criminalize conduct against minors if it was "inconvenient" to Murphy. The Commonwealth noted that the state protects minors, by using their initials rather than their name in a public document like the jury instructions. Murphy now contends that by doing so the prosecutor was telling jurors that the use of the victim's initials in the trial court's instructions was evidence of his guilt. We disagree. The prosecutor's statement, contrary to Murphy's assertion, did not align the power and prestige of the trial court with the Commonwealth's narrative. Nor, did this statement suggest to the jury that there was knowledge known to the trial court and the Commonwealth

---

14. Murphy also raises other instances of unbecoming conduct by the prosecution. These instances included the prosecutor saying that he "vomited into his mouth," after hearing Murphy's counsel's alleged mischaracterization of the evidence, an apparent reference to Murphy's counsel lacking shame, and a suggestion that he would have physically assaulted Murphy if Murphy had tried to convince him that he had magic powers. We recognize that in cases involving allegations of sexual crimes against children, that the Common-

wealth will be motivated to mount a vigorous prosecution and that our precedents afford counsel a great deal of latitude in closing argument. Yet, this latitude is not endless. While the conduct of the prosecutor did not deprive Murphy of a fair trial, the prosecutor's conduct in several instances was beneath the dignity of his office. Zealous advocacy can be achieved without insulting or disrespecting opposing counsel. We admonish the Commonwealth to not repeat this conduct in the future.

that had not been shared with them. Rather, the Commonwealth noted the common court practice of using initials rather than the names of minors to protect their privacy. While there was no error in the Commonwealth's statement, all counsel should tread carefully on the discussion of matters of trial court procedure to avoid inappropriate implications, including any suggestion the prosecutor and trial court are acting in concert.

■ Fourth, Murphy argues that the Commonwealth improperly commented on his silence. In his closing argument, the prosecutor emphasized that the Commonwealth's evidence was uncontradicted. The relevant portion of the Commonwealth's argument was as follows, "[Paul] said it happened. [Chief Hatfield and social worker Penick] testified. He admitted he sodomized him; put his mouth on his penis. That's all the proof. If we're to limit ourselves to what you hear, not much of a case against our case." Murphy contends that this statement was a comment on his decision not to testify.

■ The Fifth Amendment to the United States Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). This protection is codified in KRS 421.225, which mandates that "[i]n any criminal or penal prosecution the defendant, on his own request, shall be allowed to testify in his own behalf, but his failure to do so shall not be commented upon or create any presumption against him."

The prosecutor's statement did not directly refer to Murphy's failure to testify, rather it noted that Murphy failed to put on any witnesses at all. "Argument that a defendant had failed to contradict the prosecutor's evidence has been upheld as a

proper form of argument." *Haynes v. Commonwealth*, 657 S.W.2d 948, 953 (Ky. 1983) (citations omitted). As the Commonwealth's statement did not refer to Murphy individually or his decision not to testify, the comments were not improper.

■ Fifth, Murphy contends that it was improper for the prosecutor to refer to him as a monster. Murphy contends that this statement was designed to vilify him and that the Court has previously condemned similar language in the plurality opinion of *Sanborn v. Commonwealth*, 754 S.W.2d 534 (Ky. 1988). Sanborn was sentenced to death after being convicted of intentional murder, first-degree rape, first-degree sodomy, and first-degree kidnapping. *Id.* at 537. On review, the Court identified three specific errors, each of which mandated reversal. *Id.* at 539. The Court also discussed a series of errors in the trial, which cumulatively had the effect of qualifying as reversible error. *Id.* at 542. One of the errors identified by the Court, was the prosecutor's vilification of Sanborn during closing argument, by calling him a "black dog of a night," a "monster," a "coyote that roamed the road at night hunting women to use this knife on," and a "wolf." *Id.* at 544.

■ While the prosecutor is not permitted to vilify the accused, "[t]he legitimate scope of an argument to the jury is affected to some extent by the nature of the evidence." *Timmons v. Commonwealth*, 555 S.W.2d 234, 241 (Ky. 1977). "Outrageous conduct warrants stronger words than might otherwise be justified." *Id.* As such, the Court has tolerated severe characterizations of defendants. *See, e.g., Dean v. Commonwealth*, 844 S.W.2d 417, 421 (Ky. 1992) (referring to the defendants as "crazed animals"); *Ferguson v. Commonwealth*, 401 S.W.2d 225, 228 (Ky. 1965) (calling the defendant a "beast"); *Grigsby*

*v. Commonwealth*, 302 Ky. 266, 194 S.W.2d 363, 364 (1946) (calling the defendant a "vile brute"); *Holbrook v. Commonwealth*, 249 Ky. 795, 61 S.W.2d 644, 645 (1933) (calling the defendant a "desperado"); *Slaughter*, 744 S.W.2d at 412 (referring to the defendant as a "bit of evil"). In this context, we cannot conclude that a single reference to the defendant being a "monster," rises to the level of palpable error.

Sixth, Murphy contends that the Commonwealth introduced facts not in evidence during closing argument. In responding to Murphy's argument that his relationship with Paul was consensual, the prosecutor argued that this was not the case or else Paul would not have gone to his parents for help. There was never any evidence presented during the trial that Paul went to his parents to inform them of Murphy's actions. A second instance of the Commonwealth introducing facts not in evidence concerned the prosecutor's statement that Murphy told Paul "I'll cut your throat [if] you tell anybody." While Paul testified that Murphy threatened to kill him, the means by which Murphy planned to carry out that threat was not identified in Paul's testimony.

The Commonwealth claims that these comments were reasonable inferences from the evidence. We disagree and conclude that this portion of the Commonwealth's closing argument was improper. "In his closing remarks, a prosecutor may draw all reasonable inferences from the evidence and propound his explanation of the evidence and why it supports a finding of guilt." *Tamme v. Commonwealth*, 973 S.W.2d 13, 39 (Ky. 1998) (citing *Bills v. Commonwealth*, 851 S.W.2d 466 (Ky. 1993)). While counsel is granted substantial latitude in making argument, the fundamental issue is whether the "statement is reasonably supported by the evidence." *Padgett v. Commonwealth*, 312 S.W.3d at 353. In the case at bar, it is clear that the prosecutor's remarks were not reasonable inferences, but rather misstatements of Paul's testimony.

While the prosecutor's remarks were improper, reversal is only required if the misconduct was "flagrant" and, as such, rendered the trial fundamentally unfair. We employ a four-part test to determine whether a prosecutor's improper comments amount to flagrant misconduct. The four factors to be considered are: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Hannah v. Commonwealth*, 306 S.W.3d 509, 518 (Ky. 2010) (citing *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994), *superseded by statute* KRS 503.055 and 503.050).

As to the first factor, Murphy was prejudiced by the Commonwealth's remark that misstated the evidence of Murphy's threat, *i.e.*, the alleged graphic threat to cut Paul's throat as opposed to the more generalized "I will kill you if you tell anyone" supported by the record. As for how Paul came forward about Murphy's abuse, it is difficult to see how the incorrect statement that Paul told his parents as opposed to the correct statement that he told a co-worker was prejudicial, although clearly it was improper since not supported by the record. In any event, the Commonwealth mislead the jury about the evidence regarding Murphy's threat, so this factor weighs in Murphy's favor. As to the second factor, the Commonwealth's remarks comprised only a small portion of the prosecutor's closing argument. This factor weighs in the Commonwealth's favor.

As to the third factor, we are unable to conclude that the Commonwealth deliberately placed misleading statements before the jury. In summarizing the evidence it is just as possible that the Commonwealth inadvertently misstated the facts in the record regarding Paul's disclosure of the abuse, as it is that he purposely misstated the facts of the case. The remark regarding Murphy threatening to cut Paul's throat seems likely intended as a forceful representation of the threat to kill rather than a purposeful intent to mislead. This factor weighs in neither Murphy's nor the Commonwealth's favor. The fourth and final factor is the weight of the evidence against Murphy. There was significant evidence of Murphy's guilt. In particular, the Commonwealth offered testimony from a police officer and a social worker about Murphy admitting to engaging in sexual relations with Paul. Further, Paul provided detailed testimony about his interactions with Murphy. This factor weighs in the Commonwealth's favor.

Accordingly, the results of the four-factor test to determine whether the Commonwealth's argument was flagrant are one factor weighing in Murphy's favor, while two weigh in the Commonwealth's. As such, we cannot conclude that the Commonwealth's misstatements in closing argument were so egregious that they constitute flagrant misconduct and thereby undermine the essential fairness of Murphy's trial.

## V. Murphy's Offer of Proof About Gabbard's Excluded Testimony was Insufficient to Preserve Appellate Review Under KRE 103(a)(2).

■ Murphy also contends that the trial court erred by excluding mitigation evidence. During the penalty phase Murphy called his aunt, Naomi Gabbard, to testify. After establishing that Gabbard had known Murphy his entire life, Murphy asked her to "[e]xplain to the jury how he has been as a person." The Commonwealth objected to this question based on its opened ended nature and lack of relevance. Subsequently, the trial court asked Murphy to explain the relevance of the question of how Murphy was raised. In response, Murphy said, "[t]he relevance in how he was raised, I think it is going to go in mitigation of sentencing about how his life, there was testimony in the guilt phase about him being a victim when he was younger ... things like that." While the trial court permitted Gabbard to answer Murphy's question, it was clear that the trial court wanted to avoid a swearing contest between the defense and the Commonwealth about Murphy's good or bad character respectively. The trial court acknowledged that it would give Murphy some leeway to put on mitigation evidence through Gabbard, but that the questions would have to be narrowly tailored.

Gabbard's ensuing testimony was brief and disjointed. Repeatedly Gabbard attempted to offer speculation and hearsay about how Murphy had been impacted by the trial. The Commonwealth objected to these statements and the trial court directed Murphy to provide a basis for Gabbard's knowledge. However, Murphy's attempts to do so were unsuccessful and he discontinued Gabbard's questioning after approximately eight minutes of testimony.

■ To preserve a trial court's evidentiary ruling excluding evidence for appeal, a substantial right of a party must be affected and the substance of the evidence must be provided to the trial court. Kentucky Rule of Evidence (KRE) 103. The substance of the evidence can be made in an offer of proof, which has been defined as "adducing what that lawyer expects to be able to prove through a witness's testimony." *Henderson v. Commonwealth*, 438

S.W.3d 335 (Ky. 2014) (citing Bryan A. Garner, GARNER'S DICTIONARY OF LEGAL USAGE, p. 630 (3d ed. 2011)).

■■■■ "Generally speaking, an offer of proof must not be too vague, general, or conclusory.'" *Id.* at 342 (quoting 21 Fed. Prac. & Proc. § 5040.1 (2d ed.). While KRE 103(a)(2) does not mandate a formal offer of proof, it does require an indication of "the facts sought to be elicited or the specific facts the witness would establish." *Id.* The purpose of this is twofold. First, a detailed offer of proof provides the trial court with the necessary information to evaluate the objection based upon the actual substance of the evidence. *Id.* at 340. Second, by way of a detailed offer of proof, an appellate court can determine whether a party's substantial rights were affected by the trial court's ruling. *Id.*

In the case at bar, Murphy failed to make a sufficient offer of proof. In responding to the Commonwealth's first objection to Gabbard's testimony, Murphy stated his belief that Gabbard's testimony would be useful for the purpose of mitigation by discussing his life prior to the trial. Murphy also referenced testimony from the guilt phase that suggested Murphy might have been a victim of sexual abuse. These vague references, however, were insufficient to identify the substance of Gabbard's anticipated testimony to the trial court. Nor is the Court able to discern, from reviewing Murphy's examination of Gabbard, what specific evidence he sought to establish during her testimony. *Cf. Stansbury v. Commonwealth*, 454 S.W.3d 293, 298 (Ky. 2015). (defense counsel's questions to the witness and responses to the Commonwealth's objections were sufficient to establish what testimony he sought to elicit from the witness.). As Murphy only established the general subject matter of Gabbard's expected testimony we are unable to determine how this testimony would have affected his trial. Accordingly this claim is denied for not being adequately preserved for review.

## VI. There is no Cumulative Effect of Multiple Errors That Would Justify Reversal.

■■■■ Finally, Murphy requests that this Court overturn his convictions on the grounds of cumulative error. *See Funk v. Commonwealth*, 842 S.W.2d 476, 483 (Ky. 1992) (stating that "the cumulative effect of the prejudice" from multiple errors can require reversal). This doctrine acknowledges that "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). As we have explained, the Commonwealth failed to prove the element of forcible compulsion for first-degree sodomy and first-degree sexual abuse, and the trial court erred in failing to grant Murphy a directed verdict for those offenses. However, the necessity of reversing Murphy's conviction for those offenses does not lead us to conclude that his trial was fundamentally unfair. While the trial was certainly not error free, our review of the record demonstrates that the errors we have identified did not raise any questions as to Murphy's conviction for use of a minor in a sexual performance. As such, we reject Murphy's cumulative error argument.

## CONCLUSION

In sum, we affirm the portion of the trial court's judgment convicting Murphy of use of a minor in a sexual performance and sentencing him to ten years' imprisonment. We reverse the convictions for first-degree sodomy and first-degree sexual abuse for insufficient evidence of forcible compulsion. We hereby remand the matter, accordingly, to the Pulaski Circuit Court for

entry of an amended judgment, and any additional proceedings consistent with this Opinion.

All sitting. Minton, C.J.; Cunningham, Keller, VanMeter, and Venters, JJ., concur. Cunningham, J., concurs by separate opinion. Wright, J., concurs in result only by separate opinion.

### CUNNINGHAM, J., CONCURRING:

I concur with Justice Hughes's well written opinion. I agree that the closing argument was not prejudicial enough to warrant a reversal on those grounds.

However, as a former Commonwealth's Attorney, I cannot let this case pass without expressing more strongly my disapproval of the prosecutor's closing argument in this case. Some of his theatrics go up to the line, but are within ethical and legal bounds. However, the questions he posed directly to the defense lawyer were neither rhetorical nor argumentative. Rhetorical questions in closing arguments are to be posed to the jury with full knowledge that they are to be answered only in their deliberations and verdict. It is highly unprofessional, unfair, and inappropriate to pose such questions as were used in this case to a defense lawyer. There were at least two of these questions which required answers that the defense lawyer was procedurally muzzled to answer. In some instances, if not here, it could rise to the level of reversible error. Jurors are not fully aware of trial procedures. Such questions not only put the defendant's lawyer in an embarrassing situation, but the refusal to answer might be interpreted by the jury in a way which would be incriminating to the defendant.

Prosecution of all felony cases in this state is the responsibility of the elected Commonwealth's Attorney. The conduct of any assistants assigned by that office holder is imputed to that public servant.

Former Kentucky Supreme Court Chief Justice John Palmore—a former Commonwealth's Attorney himself—spoke eloquently to this. "One of the finest offices the public can give to a member of the legal profession in this state is that of Commonwealth's Attorney. Its very status becomes a mantle of power and respect to the wearer. Though few are apt to wear it lightly, some forget, or apparently never learn, to wear it humbly." *Niemeyer v. Commonwealth*, 533 S.W.2d 218, 222 (Ky. 1976).

Although written over forty-one years ago, it is a banner still pristine with meaning and is worth repeating.

### WRIGHT, J., CONCURRING IN RESULT ONLY:

While I agree with the majority in all other respects, I disagree as to its holding that a threat to erase one's mind through the use of black magic can never rise to the level of forcible compulsion. Paul's belief that Murphy could actually erase his mind is central to this analysis. Our brains are our most protected organs. The fact that one cannot visibly see a memory does not mean it is not physically present. Individuals do not create a memory each time they recall it—rather, it has to be physically inside our minds. Therefore, a threat to erase the mind would be a threat to remove a physical part of one's brain. This would amount to a "threat of physical force" pursuant to the statute. That being said, I agree with the majority that Murphy's threats of force in the case at bar were not temporally connected so as to create an *immediate* fear ... of physical force." KRS 510.010(2) (emphasis added).