RENDERED: APRIL 28, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0334-MR

BERRY HALL             APPELLANT

V.            
ON APPEAL FROM FLOYD CIRCUIT COURT
HONORABLE JOHNNY RAY HARRIS, JUDGE
NO. 08-CR-00070

COMMONWEALTH OF KENTUCKY             APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

In 2012, Berry Hall was found guilty but mentally ill of two counts of murder and four counts of wanton endangerment in the first degree by a Floyd County jury. On appeal, this Court reversed his conviction and remanded to the trial court for a new trial. *Hall v. Commonwealth*, 468 S.W.3d 814 (Ky. 2015) ("*Hall I*"). Hall was again convicted, this time after being found guilty of two counts of intentional murder and four counts of wanton endangerment in the first degree. He was sentenced to life in prison without the possibility of parole, consistent with the jury's recommendation. He now appeals again to this Court as a matter of right. *See* KY. CONST. § 110(2)(b). The facts surrounding the shootings are largely undisputed, and the main issue at trial was Hall's affirmative defense of insanity or, in the alternative, extreme

emotional disturbance (EED). After careful review of the record, we affirm the Floyd Circuit Court.

## I.  BACKGROUND

On March 20, 2008, Berry Hall and his family were preparing to celebrate his wife, Charlotte's, birthday. Hall's three adult sons, Tony, Bobby, and Matthew; along with Matthew's girlfriend, Darcy; were at the house they shared with their parents. This house was next to the home of Hall's niece, Lisa Tackett; her husband, Alan Tackett; and their children. The neighbors initially got along well, but over time their relationship deteriorated. By March 2008, the parties often argued over things such as property lines, the Halls' animals eating the Tacketts' flowers, and where cars were parked.

On the day in question, the Tacketts' dog roamed onto the Halls' front porch. Charlotte shooed the dog away. Shortly thereafter, Lisa began arguing with Charlotte for shooing the dog away. The argument escalated, and eventually Matthew and Darcy became involved. Lisa called Matthew and Darcy names. Charlotte went inside while Matthew and Darcy continued arguing with Lisa outside. All the while, Hall sat on the couch in his living room eating hot dogs. According to Charlotte, Hall knew that his family members were arguing with Lisa, but likely did not know exactly what was being said.

Hall asked Charlotte if she had called the local sheriff, who lived just up the road from them. Charlotte told Hall that she had, but that the sheriff had only advised her to file a complaint against Lisa the next day. Shortly

2

thereafter, Hall got off the couch and began walking upstairs. When Charlotte asked where he was going, Hall advised that he was going to go to sleep.

Hall then went into his bedroom, retrieved his .30-06 deer hunting rifle, went to the bedroom window that overlooked the Tackett residence, and opened the window. According to Hall, he loaded one bullet into the rifle. Without shooting, he aimed the gun at Lisa two times but pulled away. The third time that he aimed, he shot Lisa in the left side of her chest, killing her. Lisa was in her front yard between her house and the Hall residence when she was shot. Alan then stepped out of his front door and yelled that he was going to kill someone. When Hall heard this, he loaded another bullet into the rifle and shot Alan in the left hand. While Alan was doubled over in pain, Hall loaded his rifle with yet another bullet and shot Alan in the head, killing him. Both shots that hit Alan went through his front storm door before striking him. One shot also went through the aluminum frame of a porch swing. Alan fell onto his back, with the top half of his body lying inside of his home and the bottom half lying on the front porch. After firing the three shots, Hall collected the shell casings and put them in his pocket.

Charlotte then found Hall, still holding the rifle out the window, in the bedroom. Charlotte went back downstairs and told Tony to call 911. Tony did so, and Matthew went upstairs to Hall. Matthew took the gun from Hall, but Hall took it back and wiped off Matthew's fingerprints. The gun was placed in the corner of the room, and Matthew and Hall went downstairs. Tony and Hall then brought the four Tackett children, aged 2, 2, 3, and 4, back to the Hall

3

residence while they waited for emergency responders to arrive. It is undisputed that the children were inside the Tackett residence at the time of the shooting and did not come outside until after all three shots were fired.

Shawn Welch, who was a Kentucky State Police (KSP) trooper at the time of the shooting, interviewed Hall at the scene. A recording of this interview was played for the jury. When discussing the argument that occurred between Lisa and his family members, Hall stated, "I can't handle the screaming and hollering and stuff. I just can't handle it. I just can't handle it. I just can't handle it." While making this statement, Hall rocked back and forth in the back of the police cruiser and sobbed. Welch had to calm Hall down because he was worried Hall would inadvertently injure himself. When asked more specifically about what happened, Hall explained, "I don't know what happened. I just went upstairs and got the damn gun and shot her. I don't understand. I don't know what the fuck I was doing." Hall further explained that he takes medications[1] "for [his] nerves" to "calm [him] down . . . so [he] can tolerate people." Throughout the interview, Hall described many of the details of the shooting.

At trial, Hall presented evidence of his extensive family history of mental illness and his lengthy treatment for the same. Hall testified in his own defense, relaying many of the details of the evening of the shootings. He also explained that he began experiencing both memory issues and anger issues

---

[1] These medications were identified at trial as Ativan and Prozac.

4

when he started taking Ativan, approximately 5 years prior to the shootings. A few months before the shootings Prozac was added to his daily medication. This is when, Hall asserted, he lost control of his anger. His theory at trial was that he was insane at the time of the shooting and thus not guilty of the crimes. *See* KRS 504.020. In the alternative, Hall argued that he acted under extreme emotional disturbance at the time of the shootings, thus reducing his culpability. *See* KRS 507.020(1)(a); 507.030(1)(b).

The jury found Hall guilty of two counts of intentional murder and four counts of wanton endangerment in the first degree. He was sentenced to life in prison without the possibility of parole, consistent with the jury's recommendation. He now appeals to this Court alleging multiple errors.

## II. ANALYSIS

On appeal, Hall alleges multiple errors by the trial court warranting reversal of his conviction. First, he argues that the trial court erred in admitting an open line 911 call. Second, he argues that the trial court erred in denying his motion for a directed verdict on the four counts of wanton endangerment in the first degree. Third, he argues that the trial court erred in admitting testimony from a KSP detective about whether Hall exhibited indicators of mental illness on the night of the shooting. Fourth, he argues that the trial court erred in allowing the Commonwealth to cross-examine Hall about whether his behavior on the night in question was consistent with how an insane person would act. Fifth, Hall argues that he was denied a fair trial by the prosecutor's improper closing argument. Sixth, Hall argues that the trial

5

court erred in admitting certain photographs and a crime scene video. Finally, Hall argues that the trial court erred in refusing to instruct the jury on the burden of proof as to insanity. We discuss each allegation in turn.

## A. Open line 911 call

Hall first argues that the trial court erred in admitting an open line 911 call in its entirety.[2] The call came from 10 Sunflower Lane on the evening of March 20, 2008. Both parties agree with our description of the call in *Hall I* where we stated as follows:

> The audio recording in question is approximately 15 minutes in duration. Initially, other than the dispatcher's voice, all that can be heard is children in the background screaming and crying. The crying can be heard for about two minutes. A dog can be heard barking for much of the remainder of the call. Berry Hall's voice can also be heard a few times thereafter. About six minutes into the call, he says, "Don't come in here Tony. Get the fuck outta here." A couple minutes later he can be heard shooing away a dog, and several minutes after that, Berry can be heard asking where the ambulance is and stating, "They better hurry."

468 S.W.3d at 831. To the trial court, Hall objected to the admission of the open line 911 call. He argued the recording was irrelevant, was more prejudicial than probative, could be confusing to the jury, could mislead the jury, and was cumulative. The trial court, however, found that the call was relevant and that its probative value far outweighed the prejudice it might cause. The trial court therefore admitted the recording.

---

[2] A call is considered an "open line" call when no one responds to the dispatcher who answers the call.

To this Court, Hall makes multiple arguments regarding the admissibility of the open line 911 call. First, he argues that any relevance the open line call had resulting from Hall's statements was cumulative, as Hall's statements could already be heard in the 911 call made by Tony. Hall also argues that the open line call misled the jury as to the location of the children at the time of the actual shooting. He asserts that because the call does not contain the sound of shots being fired, the children who were crying in the background were doing so *after* the shooting rather than contemporaneously with it. Therefore, he argues, the call is not probative evidence of where the children were at the time of the shooting. Finally, Hall argues that the open line 911 call was overly prejudicial for two reasons. First, he asserts that the recording may have been used by the jury "for an improper purpose since it misled the jurors into thinking the children must have been close to their parents when they were shot." Second, Hall argues that the "tape was highly emotional, and it is hard to imagine it not generating sympathy from and inflaming the passion of the jurors."

The Commonwealth asserts that the law of the case doctrine governs the outcome of this issue. Alternatively, the Commonwealth argues that the open line 911 call is relevant, is not misleading, and is not unduly prejudicial.

We first address the Commonwealth's argument regarding the law of the case doctrine.

> The law-of-the-case doctrine is a rule under which an appellate court, on a subsequent appeal, is bound by a prior decision on a former appeal in the same court and applies to the determination of questions of law and not questions of fact. "As the term 'law of

7

the case' is most commonly used, and as used in the present discussion unless otherwise indicated, it designates the principle that if an appellate court has passed on a legal question and remanded the cause to the court below for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case."

*Inman v. Inman,* 648 S.W.2d 847, 849 (Ky. 1982) (quoting 5 Am.Jur.2d, Appeal and Error, Sec. 744). In *Hall I,* we acknowledged that "the open line 911 call does contain relevant evidence." 468 S.W.3d at 832. We explained that

[t]he statements made by Hall that can be heard on the recording are certainly credible evidence of his state of mind immediately following the shootings, which is no doubt relevant to the determination of his state of mind at the time of the shootings in regard to his claims of insanity and EED.

*Id.* However, we did not hold that the entirety of the open line 911 call would be admissible in a subsequent retrial. We reserved that decision for the trial court. We stated that "the trial court retains its discretion to make an admissibility determination with respect to this audio recording if offered on retrial and may choose to admit certain relevant portions while redacting portions that are irrelevant or otherwise deemed inadmissible." *Id.* Because we did not determine with finality the admissibility of the open line 911 call in *Hall I,* the law of the case doctrine is not determinative of the issue in this appeal.

We now turn to the admissibility of the open line 911 call. Evidentiary rulings by the trial court are reviewed for an abuse of discretion. *Little v. Commonwealth,* 272 S.W.3d 180, 187 (Ky. 2008) (citations omitted). A trial court abuses its discretion only where its decision is "arbitrary, unreasonable,

8

unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted).

In general, all relevant evidence is admissible unless excluded by the Constitution, a statute, or some other rule. KRE 402. Evidence that is not relevant is not admissible. *Id.* "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. As we explained in *Hall I*, "This is a low bar because it deems relevant . . . any evidence that tends to make a fact in consequence more or less probable, even if only minimally so." 468 S.W.3d at 832.

Even evidence that is relevant "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. Evidence is unduly prejudicial if it "is harmful beyond its natural probative force," meaning that "it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *McLemore v. Commonwealth*, 590 S.W.3d 229, 234 (Ky. 2019) (quoting ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK, § 2.10[4][b] (4th ed. 2003)) (internal quotation marks omitted).

9

"[I]n reviewing the trial judge's balancing under KRE 403, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Major v. Commonwealth,* 177 S.W.3d 700, 707 (Ky. 2005) (citations omitted). Viewing the open line 911 call in the light most favorable to the Commonwealth, we conclude that the recording was relevant to prove Hall's demeanor and state of mind immediately after the shooting. The call also gives the jury an indication of how close the children were to their parents at the time of the shooting.

Hall argues that the recording's relevance for his demeanor and state of mind immediately after the shooting is substantially outweighed by the "needless presentation of cumulative evidence," KRE 403, because Tony's 911 call includes Hall's same statements and proves the same facts. Although many of Hall's statements can also be heard on Tony's 911 call, the phone calls are not identical. Tony's call was made approximately 2 minutes after the open line 911 call was made from a different location. Further, Hall's demeanor and state of mind is not the only point on which the open line 911 call is probative. Thus, the cumulative nature of the open line 911 call does not "substantially outweigh[]" the probative value of the call.

Hall argues that the open line 911 call was not probative of the location of the children at the time of the shooting and was instead misleading on this point. He bases this argument on the fact that no shots can be heard on the open line 911 call, and thus the call must have been recorded after the

10

shooting. Therefore, according to Hall, the call only proves the location of the children after the shooting, as opposed to at the time of the shooting.

We disagree with Hall. His argument ignores the inferences that could be drawn from the evidence presented surrounding the open line 911 call. Evidence was presented that the open line 911 call came from 10 Sunflower Lane and that Tony's call came from 13 Sunflower Lane, which was the Hall residence. The portions of Tony's 911 call that can also be heard on the open line 911 call all occurred at the Tackett residence. Thus, it can be inferred that 10 Sunflower Lane, from which the open line 911 call was made, was the Tackett residence.

The jury could further infer that the open line 911 call was placed by Alan. Commonwealth's Exhibit 15 is a photograph of the lower half of Alan's body. The photograph shows what may be a cordless telephone lying on the ground next to Alan's leg. From this evidence, the jury could infer that Alan made the 911 call in the short span of time between when Lisa was shot and when Alan was shot moments later. The jury could further infer that the dispatcher did not answer the call until after Alan had been shot. If this is accurate, the open line 911 call recording started mere seconds after Alan was shot. Thus, the children's location at the beginning of the 911 call recording is highly relevant to their probable location at the time Alan was shot.

The evidence's probative value must be weighed against the danger of undue prejudice. We cannot conclude that the children's cries heard on the open line 911 call were "harmful beyond [their] natural probative force."

11

*McLemore*, 590 S.W.3d at 234 (citation omitted). Nor can we conclude that the danger that this evidence "appeal[ed] to the jury's sympathies, arouse[d] its sense of horror, provoke[d] its instinct to punish, or otherwise may [have] cause[d] [the] jury to base its decision on something other than the established propositions in the case" so "substantially outweighed" its probative value that the trial court abused its discretion in admitting the evidence. *Id.*; KRE 403. Accordingly, we find no error in the admission of the open line 911 call.

**B. Directed verdict**

Hall next argues that he was entitled to a directed verdict on the four counts of wanton endangerment in the first degree. In *Commonwealth v. Benham*, we explained:

> On a motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purposes of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

816 S.W.2d 186, 187 (Ky. 1991). "To defeat a directed verdict motion, the Commonwealth must only produce 'more than a mere scintilla of evidence.'" *Lackey v. Commonwealth*, 468 S.W.3d 348, 352 (Ky. 2015) (quoting *Benham*, 816 S.W.2d at 188). Finally, "[o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Benham*, 816 S.W.2d at 187 (citation omitted).

12

Under Kentucky Revised Statute (KRS) 508.060(a), "[a] person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." The issue in the case at bar is whether Hall's actions "create[d] a substantial danger of death or serious physical injury" to the Tackett children.

Hall argues that no evidence was presented regarding the location of the Tackett children inside of the house, that evidence was presented that the shots were fired across the front of the house rather than into the house, and that evidence was presented that the type of bullet used by Hall was designed so that the bullet stops inside of its intended target and does not travel through it. According to Hall, when these facts are viewed together, even with the remainder of the evidence viewed in the light most favorable to the Commonwealth, it would be clearly unreasonable for a jury to find him guilty of wanton endangerment in the first degree as to the four Tackett children. We disagree.

Our analysis of this issue relies in large part on the photographs entered into evidence by the Commonwealth. Although we do our best to accurately and fully describe the content of the relevant photographs, the saying "a picture is worth a thousand words" rings true. Particularly relevant to this discussion are Commonwealth's Exhibits 4, 10, 17, and 20.

13

Exhibit 4 is a photograph taken from a parking area located in front of the Tackett residence and to the side of the Hall residence. The photograph was taken so that the front of the Tackett residence is directly facing the photographer, albeit with several cars in the foreground. The top left corner of the photograph shows a part of the side of the Hall residence, including a portion of the window from which Hall shot Lisa and Alan. The Hall residence is closer to the foreground of the photograph, indicating that when Hall shot Alan, he must have been shooting at least slightly angled toward the Tackett residence.

Exhibit 10 is a photograph taken from the porch of the Tackett residence, slightly in front of where Alan was likely standing when he was shot. The photograph was taken at a slight upward angle, almost directly facing the window from which Hall shot Lisa and Alan. The Tacketts' front yard was to the photographer's left, and the front door of the Tacketts' home was to the photographer's right and just slightly behind him. The roof of the porch is seen in the top of the photograph.

Exhibit 17 is a photograph taken from the Tacketts' side yard. It was taken so that the photographer is looking almost directly across and through the Tacketts' front porch. The Tacketts' open storm door is in the center of the photograph, slightly to the right of the midline. The window from which Hall shot is in the background on the left side of the photograph, approximately one-third of the way in from the left edge of the photo. The window is angled

14

just slightly towards the Tackett residence. The parking area from which the photograph in Exhibit 4 was taken can be seen between the two residences.

Exhibit 20 is a photograph taken from the window from which Hall shot. Lisa's body is almost directly in the center of the photograph. The Tackett residence is in the top left quadrant of the photo. The front corner of the Tackett porch almost directly faces the window from which Hall shot, meaning that the houses are not perpendicular to each other but rather are slightly angled. The photographer (and therefore the window itself) is angled slightly towards the front of the Tackett residence.

Viewing these photographs together, the jury could have inferred that the bullets that struck Alan were travelling at an angle toward the Tackett residence as opposed to directly across the front of the house. Alan was standing a mere step or two outside of his front door, still inside of the open storm door. He was standing so close to the front door of his residence that when he fell after being shot, his body was positioned partly inside of the home and partly on the front porch. Given Alan's proximity to his front door, it would have been nearly impossible for a bullet shot from the Halls' bedroom window to have struck Alan while travelling directly across the front of the Tackett residence.

Had a bullet intended for Alan missed its mark, its most probable path was into the front of the Tackett residence. Hall implies that this was unlikely because he is such a skilled marksman. However, we cannot allow the subjective skill of a hunter to be solely determinative of whether the

15

Commonwealth presented sufficient proof of wanton endangerment. There are many variables affecting the risk that a bystander will be seriously injured, including movement of the target, distraction of the shooter, and environmental elements such as wind. While the skill of the shooter may factor somewhat into our analysis, it does not outweigh the other risk factors to the Tackett children.

Hall's argument regarding the type of bullet he used is also unpersuasive. Hollow point bullets are designed so that they stop inside of their intended target instead of traveling through it. Because of this, the bullets from Hall's shots remained lodged in Hall's victims' bodies. However, two of the bullets went through intermediary objects before hitting their target. Both of the shots fired at Alan went through the glass storm door before striking him. One of those shots also went through the aluminum frame of a porch swing before going through the storm door and then into Alan's head. This demonstrates that had either of the shots missed Alan, they could have gone through the exterior wall of the house and into the home, thus endangering the children inside.

The factual scenario presented in the case at bar is novel for this Court, excepting *Hall I*. However, because testimony is elicited and facts are developed differently at each trial, we cannot rely solely on our analysis in Hall's previous appeal before this Court. We must consider only the evidence presented to the jury in Hall's retrial. However, after doing so, we reach the same result based on similar reasoning.

16

We have often explained that "[f]iring a weapon in the immediate vicinity of others is the prototype of first degree wanton endangerment. This would include the firing of weapons into occupied vehicles or buildings." *Swan v. Commonwealth*, 384 S.W.3d 77, 102 (Ky. 2012) (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 9–4(b)(2), at 388 n.142 (1998)). However, the facts of this case include neither a weapon being fired in close proximity to someone nor shots being fired into an occupied house. Instead, this case involves shots being fired *towards* a house containing four children. Although the shots did not enter the residence, they most likely would have had Hall missed his target.

We have explained that behaviors such as "firing a gun very near another person or into an occupied car or house" are not the only actions that will constitute first-degree wanton endangerment. *Id.* at 103. "Rather, they are simply clear examples of behavior that is sufficient to constitute the crime and not examples of necessary behavior. They are examples of the severe enough behavior that other behaviors must approach to be first-degree wanton endangerment." *Id.* After a careful review of the evidence presented, we conclude that Hall's behaviors at issue in this case are also "severe enough . . . to be first-degree wanton endangerment." *Id.*

Hall fired three shots from a high-power deer rifle outfitted with a scope. The bullets he shot had the capacity to, and in fact did, go through intermediary objects before hitting their targets, indicating they could have gone through the exterior walls of the house and into the residence. Two of

17

those shots were aimed towards the Tackett residence and almost certainly would have proceeded into the residence had they not struck Alan first. Hall testified that he took some of the shots so quickly that he did not know when he shot and that he may not have even been looking, thus increasing the chances that one of the shots might have missed its target.

The evidence is clear that the four Tackett children were inside of the Tackett residence at the time of the shooting. Although their exact location inside of the home is not known, we need "not consider the precise location of each of the victims inside of [the] home in affirming the denial of the directed verdict." *Hall I*, 468 S.W.3d at 829; s*ee also Paulley v. Commonwealth*, 323 S.W.3d 715, 724 (Ky. 2010). The open line 911 call and the inferences that can be drawn from it, discussed supra, provided sufficient evidence that the Tackett children were likely in close proximity to Alan when he was shot, and therefore in substantial danger of death or serious physical injury. This conclusion is further bolstered by the size of the Tackett residence and the ages of the Tackett children. It is easily ascertained from the crime scene photographs and video that the Tackett residence was of a relatively small size. The children could not have been very far away from Alan at the time of the shooting, as there was just not that much space inside of the home. Further, the children were of such tender age that a jury could reasonably infer that they were in close proximity to their parents at the time of the shooting. Accordingly, the Commonwealth met its burden of producing "more than a mere scintilla of evidence" such that it would not "be clearly unreasonable for a

18

jury to find guilt." *Benham*, 816 S.W.2d at 187–88. The trial court did not err in denying Hall's motion for a directed verdict on the wanton endangerment charges.

## C. Detective Cramer's testimony

Hall next argues that the trial court erred in admitting testimony from Det. Cramer regarding whether Hall exhibited indicators of mental illness. During the Commonwealth's direct examination of Det. Cramer, the following exchange occurred:

> Commonwealth's Attorney (CW): Did you observe anything in your interactions with him to lead you to believe that he was mentally ill in any way or a danger at that point?
>
> Det. Cramer (W): No, sir. We have particular protocols for instances like that. It's not a real common occurrence but it does occur and if in our assessment of someone we feel like that is the attention that they need then they are taken to an evaluation place, generally in Hazard for this area, I believe.
>
> CW: To the psych ward?
>
> W: Yes.
>
> CW: Have you arrested or been involved in cases in the past where someone was arrested and in such a mental state that they were taken to the psych ward instead of the jail?
>
> W: Yes, sir. It's been a long time, but yes.
>
> CW: But you didn't do that here?
>
> W: No, sir. I didn't. I didn't see any indicators.
>
> CW: If the defendant had exhibited symptoms that would justify that, would you have taken him?
>
> W: Yes, sir.

Hall then objected on the basis that Det. Cramer was beginning to testify to expert knowledge regarding mental health without having been established as an expert in that field. The trial court overruled the objection, stating that if the detective was trained to look for indicators of mental illness, then his testimony was admissible.

To this Court, Hall seems to concede that Det. Cramer's testimony was not expert testimony but was, instead, lay opinion testimony. Hall argues that because Det. Cramer did not speak to Hall until after Hall had been transported to the jail, Det. Cramer did not have the requisite personal knowledge of how Hall acted immediately after the shooting to render an opinion on whether Hall exhibited symptoms of mental illness.

Because this issue involves the admissibility of evidence, we review the ruling by the trial court for abuse of discretion. *Little*, 272 S.W.3d at 187 (citations omitted). A trial court abuses its discretion only where its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945 (citations omitted).

Under Kentucky Rule of Evidence (KRE) 701(a), opinion testimony from a lay witness must be "[r]ationally based on the perception of the witness." In order to satisfy this requirement, "[a] witness must have personal knowledge" of that to which he testifies. *Davidson v. Commonwealth*, 548 S.W.3d 255, 258 (Ky. 2018) (quoting ROBERT G. LAWSON, KENTUCKY EVIDENCE LAW HANDBOOK § 6.05[2][c], 417 (5th ed. 2013)). Hall argues that Det. Cramer did not have personal knowledge of Hall's actions or demeanor close enough in time to the

20

shootings to allow Det. Cramer to provide an opinion on whether Hall should have been arrested or been taken to a psychiatric hospital. This argument mischaracterizes Det. Cramer's testimony.

Det. Cramer was not asked about and did not testify to Hall's mental status close in time to the shooting. He also was not asked and did not testify to his opinion regarding whether Hall should have been taken from the scene of the shooting to a psychiatric hospital rather than to the jail. Instead, Det. Cramer testified to his personal observations of Hall when he *did* interact with him, which was later in the evening and after Hall had already been transported to the jail. Det. Cramer testified that specifically *at that time* Hall was not displaying any indicators that would have caused Det. Cramer to transport him to a psychiatric hospital. This information was certainly within Det. Cramer's personal knowledge. The amount of time that passed between the shooting and Det. Cramer's observations of Hall would affect the weight of the evidence as opposed to its admissibility. Accordingly, the trial court did not abuse its discretion in admitting this evidence.

## D. Hall's testimony

Hall next argues that the trial court erred in allowing the Commonwealth, during its cross-examination, to ask Hall whether "the way that he shot the victims was how a mentally ill person or a person who was enraged would shoot." Specifically, Hall complains about the following exchange:

21

Commonwealth Attorney (CW): What you are describing and what you are asking this jury to believe is that you were in some kind of enraged, out of control state when you did this?

Hall (H): That's right.

CW: Now, if you were in the state of mind you say, wouldn't we be more likely to see that you had took that gun, and went out the window, and BAM BAM BAM, and screaming, and just shooting wildly, like a crazy angry person? Isn't that more like what a person in that state of mind would do?

H: That's pretty much what happened there.

CW: No, that ain't what you did. If you had shot wildly out of the window, yelling, and screaming and out of control, you wouldn't hit three for three?

Hall's counsel then objected, arguing that Hall could not give an opinion about how people in certain psychological states would act. The Commonwealth responded that it was merely asking Hall for his opinion. The trial court ordered the Commonwealth to rephrase the question. The parties then walked away from the trial court bench without Hall's counsel requesting any additional relief. The Commonwealth then continued its questioning of Hall.

CW: You said you were out of control and that you had anger so bad that you were literally yanking the gun back from the window as you tried to control yourself from shooting, isn't that what you testified to?

H: I evidently must have been trying to stop what was going on there and couldn't.

CW: But when it comes time to shoot, you placed three experts, as you said, accurate shots at your targets and killed both of them didn't you?

H: Evidently.

Hall did not object to this continued line of questioning.

22

Hall asserts that through the Commonwealth's questioning of him, reiterated in closing, it made "the argument that individuals who are enraged, or angry, or inflamed—acting under extreme emotional disturbance or a mental illness—would not be able to commit their crimes in a precise and calm way." Hall argues that the Commonwealth's questioning of him violated the prohibition set forth in *Johnson v. Commonwealth* that the Commonwealth cannot "cross examine about the habit of a class of individuals for the purpose of showing how one unique individual in that class might have acted on a given occasion," as doing so "would invite the jury to arbitrarily hold an individual responsible based on his membership in the class." 885 S.W.2d 951, 953 (Ky. 1994).

To the extent the Commonwealth violated *Johnson*'s prohibition, Hall waived any claim of prejudice by failing to request an admonition. By ordering the Commonwealth to rephrase its question, the trial court implicitly sustained Hall's objection to the first set of questions about which Hall complains. Hall, however, then requested no further relief. Specifically, he did not request that the trial court admonish the jury regarding the Commonwealth's improper questions and Hall's responses. "[W]here an admonishment is sufficient to cure an error and the defendant fails to ask for the admonishment, we will not review the error." *Lanham v. Commonwealth,* 171 S.W.3d 14, 28 (Ky. 2005) (citing *Graves v. Commonwealth,* 17 S.W.3d 858, 865 (Ky. 2000)); s*ee also Coulthard v. Commonwealth,* 230 S.W.3d 572, 578 (Ky. 2007) ("However, an

23

admonition was never requested and thus, any claim that Appellant was prejudiced by the lack thereof was waived.").

Hall also cites two questions that the Commonwealth asked him after his objection. In those two questions, the Commonwealth asked him about what he did on the evening of the shooting and how he did those things. The Commonwealth did not ask him for his opinion on how an insane person would act or attempt to show that his actions either did or did not conform to the way in which an insane person would act. As such, they were admissible, and the trial court did not err in admitting them.

## E. Commonwealth's closing argument

Hall next argues that he was denied a fair trial by the Commonwealth's implication that Hall testified for the first time at the retrial that he blacked out immediately before the shooting, when in fact the Commonwealth's Attorney knew that Hall had testified to this during his first trial. Specifically, Hall complains of the following statement made by the Commonwealth during its closing argument:

> The defendant claimed that he blacked out when he went upstairs. Do you remember that? He never told the police that in two lengthy interviews. He never said anything about blacking out. And after twelve years to think about it, he decides to come in yesterday and say, "I blacked out."

Hall acknowledges this argument was not preserved and requests palpable error review pursuant to Kentucky Rule of Criminal Procedure (RCr) 10.26.

"Prosecutorial misconduct is 'a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or

24

assess an unjustified punishment.'" *Commonwealth v. McGorman*, 489 S.W.3d 731, 741–42 (Ky. 2016) (quoting *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011)). One way in which prosecutorial misconduct can occur is through an improper closing argument. *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016) (citing *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010)).

> In considering an allegation of prosecutorial misconduct in closing argument, the Court considers the arguments as a whole while remembering that counsel is granted wide latitude during closing argument. The longstanding rule is that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn therefrom.

*Murphy v. Commonwealth*, 509 S.W.3d 34, 50 (Ky. 2017) (internal citations and quotation marks omitted).

Any allegation of misconduct must be viewed in the context of the overall fairness of the trial. *McGorman*, 354 S.W.3d at 742 (citing *St. Clair v. Commonwealth*, 451 S.W.3d 597, 640 (Ky. 2014)). If the misconduct is not objected to, this Court "will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair." *Duncan*, 322 S.W.3d at 87 (citations omitted). We employ a four-part test to determine whether a prosecutor's improper comments amount to flagrant misconduct. The four factors to be considered are: (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused. *Murphy,* 509 S.W.3d at 54

25

(internal citations and quotation marks omitted). We address each part of the test in turn.

First, the comments made by the Commonwealth's Attorney during his closing argument tended to mislead the jury into believing that Hall had never before stated that he blacked out. Relevant to this point is that the period during which Hall claims to have blacked out is quite limited: Hall's testimony indicates that after he got up from his couch he blacked out and could not remember going up the stairs or getting his gun. Hall did not assert that he was in a black-out condition when he was actually shooting the gun. Although Hall did not explicitly state during his police interviews on the evening of the shootings that he had blacked out, he did state several times that he did not know what happened and did not understand what happened, but that he had merely started shooting. Further, Tony testified that when he visited Hall at the jail after the shooting, Hall told him that he could not remember what happened. Finally, the Commonwealth's Attorney knew that Hall testified at his first trial that he blacked out. Viewed in context, the Commonwealth's Attorney's statements during closing argument tended to mislead the jury. This factor weighs in favor of Hall.

The second part of the test for flagrant prosecutorial misconduct is whether the comments were isolated or extensive. In this case, Hall complains of just a few sentences that were spoken in the middle of the Commonwealth's closing argument that lasted approximately 55 minutes. They were not

26

repeated during the closing argument or even emphasized. As such, the comments were isolated, and this factor weighs in favor of the Commonwealth.

Next, we turn to whether the prosecutor's comments were deliberately or accidentally placed before the jury. We are unable to conclude that the Commonwealth's Attorney deliberately misstated the facts in order to mislead the jury. The only sentence contained in the comments in question that was misleading was, "And after twelve years to think about it, he decides to come in yesterday and say, 'I blacked out.'" The previous two sentences within this section of the Commonwealth's closing argument were true—that Hall never told the police during his two lengthy interviews in the hours after the shootings that he blacked out. Because of this, it is just as likely that the Commonwealth's Attorney was merely inartful in describing a seeming change in Hall's memory as it is that he deliberately made the statement to mislead the jury. As such, this factor weighs in neither Hall's nor the Commonwealth's favor.

The final factor is the strength of the evidence against Hall. The fact that Hall shot and killed both Lisa and Alan is undisputed. The only disputed issue is his level of culpability—whether Hall was guilty of intentional murder, not guilty by reason of insanity, or guilty of a lesser offense because he was acting under extreme emotional disturbance. Hall presented evidence of his extensive family history of mental illness. He also presented evidence that Prozac, one of the medications he was taking, carried a risk of side effects including mood or behavior changes, anxiety and agitation, emotional lability, depersonalization,

aggression, anti-social reactions, anger, and mental status changes, although those side effects were rare. He testified that he experienced some of these emotions—specifically anger—after he began taking Prozac. However, Hall's only mental health expert, Dr. Timothy Allen, testified that Hall's medications did not cause him to shoot Lisa and Alan. In fact, Dr. Allen testified that there is no research indicating that the medications Hall was taking caused violent behavior. Further, Dr. Allen testified that he did not believe there was any evidence that Hall was insane at the time he committed the crimes. Hall presented virtually no testimony other than his own linking his shooting Lisa and Alan to his medication or to mental illness. Therefore, the final factor weighs in favor of the Commonwealth.

After applying the four-factor test to determine whether the Commonwealth's argument was flagrant, we conclude that one factor weighs in Hall's favor, while two weigh in the Commonwealth's favor. As such, we cannot conclude that the Commonwealth's statements in closing argument were so egregious that they constitute flagrant misconduct or that they undermined the essential fairness of Hall's trial. *See id.* at 55.

**F. Photographs and crime scene video**

Hall next argues that the trial court erred in admitting certain photographs and a video of the crime scene. During the trial, the jury viewed 19 photographs of the crime scene and a ten-minute video of the scene. Hall argues that many of the photographs were duplicative and unnecessary and that because the photographs were admitted, the video was duplicative and

28

unnecessary. He further argues that because they were duplicative, their probative value was low and was outweighed by the risk of undue prejudice.

We review the trial court's admission of photographic evidence for abuse of discretion. *Holbrook v. Commonwealth*, 525 S.W.3d 73, 85 (Ky. 2017) (citing *Meskimen v. Commonwealth*, 435 S.W.3d 526, 534 (Ky. 2013)). "The general rule is that a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992) (citation omitted). In making admissibility decisions regarding graphic videos or photos, the trial court must undertake a KRE 403 analysis. *Hall I*, 468 S.W.3d at 823. KRE 403 allows relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." This Court has further explained, "[w]hen ruling on the admissibility of a gruesome photograph, the trial court should consider whether evidentiary alternatives would sufficiently prove the fact at issue without a comparable risk of prejudice. However, the evidence must be highly inflammatory and prejudicial to compel a party to employ evidentiary alternatives." *Ratliff v. Commonwealth*, 194 S.W.3d 258, 271 (Ky. 2006) (internal citations omitted). Finally, "the probative worth of each additional gruesome photograph [will] be incrementally discounted as the facts to be proven become ever more certain[,]" and the "admission of additional photos

will also correspondingly increase the danger of undue prejudice." *Hall I*, 468 S.W.3d at 826.

Hall complains of some non-gruesome photos as well as some photos that he describes as gruesome. We begin our analysis with the non-gruesome photos: Commonwealth's Exhibits 6, 8, 9, 17, and 18. Exhibit 6 shows the top of the stairs in the Hall residence. These are the stairs Hall ascended in order to get to his bedroom and commence shooting Lisa and Alan. Hall argues that this photograph is cumulative of Exhibit 5 (to which Hall did not object), which also shows the stairs in the Hall residence. Exhibit 5 shows the stairs from the bottom, and only three stairs are visible, as the stairs then turn to the left. These two photos are not duplicative, as they show different portions of the staircase, each which cannot be seen in the other photo. Although Exhibit 6 does not have a high probative value, it is still relevant because it provides a visual depiction of the scene. The probative value may be slightly decreased by the admission of the crime scene video, but it is not completely diminished. Further, Exhibit 6 causes virtually no prejudice at all, and therefore its probative value is not "substantially outweighed by the danger of undue prejudice . . . or needless presentation of cumulative evidence." KRE 403. Accordingly, the trial court did not err in admitting Commonwealth's Exhibit 6.

Commonwealth's Exhibits 8 and 9 are of the Halls' bedroom from which Hall shot Lisa and Alan. Hall argues that these photographs are cumulative of Exhibit 7 (to which Hall did not object) which also shows the Halls' bedroom. Exhibit 7 shows the room from the doorway providing a wider view of the room,

30

including most of the bed, the window from which Hall shot, and the rifle Hall used. Exhibit 8 is a closer photo that shows the side of the bed where Hall was positioned when he shot and a portion of the window. Finally, Exhibit 9 shows the very top part of the bed and the entire window. Although the probative value of Exhibits 8 and 9 is limited, that value is balanced against the almost non-existent risk of undue prejudice. Therefore, the trial court did not err in admitting Exhibits 8 and 9.

Hall also argues that Commonwealth's Exhibits 17 and 18 are cumulative of Exhibit 19. Commonwealth's Exhibit 17 is a photograph taken from the Tacketts' side yard, described above.[3] The Tackett residence, including the front porch, is on the right side of the photograph, and the Hall residence, including the window from which Hall shot, is on the left side of the photograph. Exhibit 18 is a photograph of the Tacketts' storm door with a larger bullet hole centered in the photograph and a smaller bullet hole barely visible to the left of the larger hole. Exhibit 19 (to which Hall did not object) also shows the storm door. Exhibit 19, however, is a closer view of the storm door, focused on the two bullet holes. The smaller hole is much more easily seen in Exhibit 19 than in Exhibit 18. Exhibit 19 shows almost none of the front porch and does not show the Hall residence at all. Exhibit 17 is very

---

[3] "Exhibit 17 is a photograph taken from the Tacketts' side yard. It is taken so that the photographer is looking almost directly across and through the Tacketts' front porch. The Tacketts' open storm door is in the center of the photograph, slightly to the right of the midline. The window from which Hall shot is in the background on the left side of the photograph, approximately one-third of the way in from the left edge of the photo. The window is angled just slightly towards the Tackett residence."

different than Exhibit 19, and therefore is in no way cumulative of that photograph. It is also highly probative. It provides important context as to the spatial relationship between the two residences, as well as the spatial relationship of the Halls' bedroom window to the front porch and storm door of the Tackett residence. Further, although Exhibits 18 and 19 both show the Tacketts' storm door, they do so from different angles. Exhibit 18 provides a view that is from slightly farther away, showing where the bullet holes were in relation to the rest of the storm door. Exhibit 19 shows the smaller bullet hole more clearly. Thus, the trial court did not err in admitting Commonwealth's Exhibits 17 and 18, as their probative value was not "substantially outweighed by the danger of undue prejudice . . . or needless presentation of cumulative evidence." KRE 403.

Hall next argues that the trial court erred in admitting certain photographs that he describes as gruesome: Commonwealth's Exhibits 12, 13, and 14. We described each of these photographs in *Hall I*:

> Exhibit 12[] is a view of the Tacketts' front yard and porch from a distance. It shows Lisa's body, lying face up, at the foot of the porch steps. It also shows Alan's body, partially hidden from view, lying on the porch. To the left of Alan's body, an open storm door, with shattered glass, is partially obscured by a porch column. No blood, soft tissue, or other specific evidence of injury is discernable. Exhibit 13 is a photo of the same scene but taken approximately 20 to 30 feet closer to the house.

468 S.W.3d at 820 (footnote omitted). Exhibit 13 is taken looking slightly downward, focusing on Lisa's body. Exhibit 14 "is taken from about the same position as Exhibit 13, but is directed straight ahead and focused on the porch and open front door of the house. Lisa's body is visible from the neck down and

32

the lower portion of Alan's body can be seen." *Id.*[4] Although we do not necessarily agree with Hall's categorization of these photos as gruesome, that point is not determinative of our analysis. Hall's primary argument is that these photographs are cumulative of each other and the crime scene video, and that only one of them should have been admitted at trial. Although all three photographs are taken of the same portion of the crime scene, they are taken from different angles and at different distances. Further, in part because they are not truly gruesome, the accompanying risk of undue prejudice is low. Therefore, the trial court did not err in admitting Commonwealth's Exhibits 12, 13, and 14, as their probative value was not "substantially outweighed by the danger of undue prejudice . . . or needless presentation of cumulative evidence." KRE 403.

Finally, Hall argues that the trial court erred in admitting the ten-minute crime scene video as it was both cumulative and prejudicial. Hall asserts that because the photographs were admitted at trial, the video was unnecessary. The video begins at the Hall residence, goes into the Halls' bedroom, and shows the window from which Hall shot and the rifle that Hall used. The videographer then proceeds down the Halls' steps, out of the Hall residence, and to the Tackett residence. The video shows the bodies of both victims and where pieces of Alan's tissue had landed inside of the Tackett residence. Then, the video shows the Tacketts' storm door, the porch swing, and the Halls' bedroom

---

[4] The described photograph was Exhibit 16 at the first trial. In Hall's retrial, it was renumbered to Exhibit 14.

window (viewed from the Tacketts' porch). The video attempts to show the angle from which the shots must have been fired to go from the window and through both the frame of the porch swing and the storm door.

"[A] videotape of a crime scene, including the position of the victim's body and the location and nature of the victim's injuries, is just as admissible as a photograph, assuming a proper foundation is laid. This is true, even though the scene depicted may be gruesome." *Young v. Commonwealth*, 50 S.W.3d 148, 169 (Ky. 2001) (internal citations omitted). We have acknowledged that sometimes "video evidence provide[s] a more accurate account of the crime scene" than can be conveyed through testimony and photographs. *Baumia v. Commonwealth*, 402 S.W.3d 530, 542 (Ky. 2013). In this case, the video did just that. The video provided the jury a perspective and context that it would not have otherwise had. Because of this, it was highly probative. Although the video carried with it a risk of prejudice, "[t]he primary danger from such evidence is 'emotionalism'—*i.e.*, that the graphic photos will 'arouse biases and sympathies, provoke animosities, and inflame passions that obstruct careful thought and judgment.'" *Hall I*, 468 S.W.3d 814, 824–25 (quoting ROBERT G. LAWSON, KENTUCKY EVIDENCE LAW HANDBOOK § 2.15[3][b] at 92 (5th ed. 2013)) (footnote omitted). The risk of emotionalism was not high, and any risk that did exist did not substantially outweigh the probative value of the crime scene video. Thus, the trial court did not err in admitting the video.

## G. Jury instructions

Hall's final argument is that he was denied due process of law when the trial court refused to instruct the jury on the burden of proof for the defense of insanity. The law on this issue is well-settled, but Hall urges this Court to reconsider that precedent.

The trial court provided the jury with an instruction on the burden of proof that stated,

> In this case, the offenses charged must be established beyond a reasonable doubt. The burden of establishing such guilt rests upon the Commonwealth from the beginning to end of the trial. The Commonwealth must establish beyond a reasonable doubt every fact essential to prove every element of the offense charged. Unless and until the Commonwealth proves that the Defendant is guilty beyond a reasonable doubt, you must consider him innocent and find him not guilty.

Hall asked the trial court to include within that burden of proof instruction the following additional language regarding the burden of proof on the defense of insanity, "The defense of insanity is an affirmative defense. This means that the defense must prove that the defendant was insane at the time of the offense. This defense must be proven to your satisfaction by a preponderance of the evidence rather than beyond a reasonable doubt." The trial court denied his request.

This Court has explicitly addressed and rejected Hall's argument on this issue. *Brown v. Commonwealth*, 934 S.W.2d 242 (Ky. 1996); *Star v. Commonwealth*, 313 S.W.3d 30 (Ky. 2010). In *Brown*, the trial court denied the defense's requested instruction "which defined the preponderance of the evidence standard the defense had to meet in proving Appellant's insanity."

35

934 S.W.2d at 247. Brown argued "that failure to give the jury this instruction rendered it questionable whether or not the jury understood the defense's burden of proof." *Id.* We held that the trial court did not err, stating, "[T]his is a non-issue as counsel was free to argue the preponderance burden to the jury." *Id.* Finally, we noted that "this Court has reiterated its dissatisfaction with use of the word 'preponderance' in jury instructions." *Id.* (citing *Hardin v. Savageau*, 906 S.W.2d 356, 358 (Ky. 1995)).

In *Star*, we relied on *Brown* to again reject an argument that it was error for the trial court to refuse "to instruct the jury that [the defendant] was required to prove insanity by a preponderance of the evidence." 313 S.W.3d at 37. We again acknowledged "our reluctance to use the word 'preponderance' in jury instructions," and explained that "trial counsel was fully able to articulate this burden to the jury." *Id.*

This Court's aversion to the use of the word "preponderance" in jury instructions dates back to at least 1896. In *Ragsdale v. Ezell,* our predecessor Court explained that when the word "preponderance" is used in the jury instructions, it often serves to confuse the jury rather than assist it. 99 Ky. 236, 35 S.W. 629, 630 (1896). That court stated,

> [W]hen a trial court undertakes to place the right of recovery upon the preponderance of testimony in favor of the plaintiffs or those holding the affirmative of the issue, it often becomes necessary to explain what is meant by the preponderance of proof, and, in doing so, a jury is often misled by the trial court.

*Id.* Instead of using the word "preponderance" in the jury instruction, the Court advised that

the jury should be told: "*If they believe from the evidence* that the defendant Ragsdale assaulted the plaintiff, as charged in the petition, the plaintiffs are entitled to recover, not only the actual damage sustained, but such further sum, by way of exemplary damages, as the case may warrant, not exceeding the amount claimed."

*Id.* (emphasis added). The Court went on to conclude that "[t]he word 'preponderance' should be omitted from such instructions, as it is only calculated to embarrass the jury when considering the issue." *Id.*

In *Hardin v. Savageau,* a 1995 case relied upon by *Brown,* we further explained and expounded on the holding in *Ragsdale.* 906 S.W.2d 356. We explained that "[t]he only proper conclusion one should reach from *Ragsdale* is that use of the term 'preponderance' is redundant and bad practice, and that any attempted definition of 'preponderance' is perilous." *Id.* at 358. We further stated that when the standard of proof is something other than preponderance of the evidence, the appropriate standard should be stated in the jury instructions. *Id.* Thus, when a jury is required in a civil case to find a fact by clear and convincing evidence or in a criminal case by proof beyond a reasonable doubt, the jury should be instructed as such. We explained that "[i]n each [situation], the required phrase is capable of being understood and applied by jurors of ordinary intelligence." *Id.* at 359. The same is not true of the standard of preponderance of the evidence, as that phrase "may not be easily understood and is essentially redundant." *Id.* Instead, "[t]he prevailing practice of merely instructing the jury that to render a verdict it must 'believe'

or be 'satisfied' from the evidence is entirely appropriate when the standard is preponderance." *Id.*

Returning now to the instructions given in the case at bar, the instruction regarding the defense of insanity stated, in relevant part,

> Even though you might otherwise find the Defendant guilty of one of the offenses mentioned in these Instructions, if you believe from the evidence that at the time he committed the offense he was insane, you shall find him not guilty and state in your verdict that you find him not guilty by reason of insanity.

This instruction appropriately incorporated the preponderance standard through its use of the phrase "if you believe from the evidence," consistent with our holding in *Hardin*.

Finally, as in *Star*, Hall's trial counsel "was fully able to articulate this burden to the jury" and did so seemingly successfully. 313 S.W.3d at 37. Hall's counsel explained to the jury that insanity is an affirmative defense and that the standard by which the defense must prove insanity is preponderance of the evidence. She further explained that preponderance of the evidence was not the same as proof beyond a reasonable doubt and even went so far as to tell the jury that she was "glad" the standard was lower because she "couldn't prove" Hall's insanity beyond a reasonable doubt. This is exactly what we called defense attorneys to do in *Star*. The jury did not submit any questions to the trial court that indicated any confusion regarding the shifting burden of proof and the changing standard of proof, lending support to our conclusion that defense counsel was successful in explaining these concepts during closing argument.

We decline to revisit or overrule our precedent as it relates to instructing the jury on the burden of proof and standard of proof regarding an insanity defense. Accordingly, the trial court did not err in refusing to instruct the jury on these concepts.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Floyd Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Emily Holt Rhorer
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Aspen Caroline Carlisle Roberts
Assistant Attorney General